# IN THE SUPREME COURT OF IOWA

No. 16–2152

Filed May 4, 2018

**IN THE INTEREST OF Q.G. AND W.G.,**
Minor Children.

**A.P.,** Mother,

Appellee,

**B.G.,** Father,

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Hancock County, Karen Kaufman Salic, District Associate Judge.

Father requests further review of district court order terminating his parental rights in two minor children. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED.**

Grant C. Gangestad of Gourley, Rehkemper & Lindholm, P.L.C., West Des Moines, for appellant.

Dani L. Eisentrager of Eisentrager Law Firm L.L.P., Eagle Grove, for appellee.

Lynn Collins Seaba of Malloy Law Firm, L.L.P., Goldfield, guardian ad litem for minor children.

**APPEL, Justice.**

In this case, we are called upon to make one of the most difficult and consequential decisions we as judges face, namely, whether the rights of a parent should be terminated in a private action filed by the other parent under Iowa Code chapter 600A (2016). After a hearing on termination petitions brought by the mother, A.P., the district court, sitting as a juvenile court, entered an order terminating the parental rights of B.G., the father of young children, Q.G. and W.G.

B.G. appealed. Among other things, B.G. asserted the custody provisions of a stipulation in a recent prior dissolution action prevented the district court from hearing the termination action. In the alternative, B.G. argued the district court could only consider events that occurred after the entry of the stipulation in the dissolution action. Further, B.G. argues A.P. failed to show that termination was in the best interest of the children by clear and convincing evidence. Finally, B.G. asserts the district court erred in admitting certain documents into evidence that should have been excluded on hearsay grounds.

We transferred the case of the court of appeals. The court of appeals affirmed the judgment of the district court. We granted further review.

We allow the decision of the court of appeals on evidentiary issues to stand. *See In re Marriage of Schenkelberg*, 824 N.W.2d 481, 483 (Iowa 2012) ("In considering an application for further review, we have discretion to review all or part of the issues raised on appeal or in the application for further review."); *In re Marriage of Becker*, 756 N.W.2d 822, 824 (Iowa 2008) (same). On the remaining issues, for the reasons expressed below, we vacate the decision of the court of appeals and reverse the judgment of the district court.

## I. Factual and Procedural Background.

Based on our de novo review of the entire record, we find the following facts.

**A. Background of the Parties.** B.G. graduated from high school and attended some college. In his late teens, his mother had concerns about his possible suicidal tendencies. While in high school and college, he saw doctors and psychologists for depression and was on prescription medication for some time.

B.G. has a history of involvement with drugs. During high school, B.G. used marijuana. B.G. also has alcohol abuse issues and was arrested twice for operating a motor vehicle while intoxicated (OWI). B.G. admits using methamphetamine sporadically beginning in 2004.

In 2006, a woman that B.G. had been dating for a short period gave birth to a child. B.G. at first questioned whether the child was his. Upon learning that he was, in fact, the biological father, in 2008 B.G. voluntarily allowed the termination of his parental rights so that a stepfather could adopt the child. According to B.G., he did not see why he should "throw [himself] into something that was working good at that time." He testified at the termination hearing that he had made a mistake and that he regretted his decision, noting the person who adopted his child is no longer part of the child's life.

B.G. met A.P. while volunteering at a grade school sporting event in the fall of 2007. They began dating. After the passage of several months, B.G. became suspicious that A.P. had a relationship with another man, which, when confronted, A.P. admitted.

Nonetheless, the relationship between A.P. and B.G. continued. During the course of the relationship, A.P. was under stress dealing with

the illegal behavior and ultimately the death of her mother. B.G.'s parents "took her in" and treated her as one of the family.

A.P. and B.G. were married in the fall of 2009. A.P. had a well-paying job that she enjoyed, while B.G. had a factory job that he did not like.

Q.G. was born in early 2011. A.P. took an extended maternity leave of several months before returning to work. A.P. and B.G. mutually decided B.G. would quit his factory job to stay home and take care of the baby. In the months immediately following A.P.'s return to work, the record does not reveal any parenting issues between B.G. and A.P.

In the fall of 2011, B.G. began seasonal employment outside the home. Shortly thereafter, B.G. resumed using methamphetamines and ultimately other drugs such as hydrocodone. At the time he began using meth, B.G. suspected A.P. was having another affair and began distancing himself from Q.G. B.G.'s drug use continued after the birth of W.G. in 2013. The children were sent to daycare so B.G. could use methamphetamine during the day at home without the presence of the children. In addition to using, B.G. on occasion sold drugs.

A.P. and B.G. argued over her work commitments, performance of housework, and payment of bills. According to A.P., "[i]t was hell in the house." When A.P. returned home from work, B.G. would leave for the evening. By October 2014, B.G. had informed his father he could not take it anymore and wanted out of the marriage.

During the marriage, B.G. maintained a gun collection. Included in the gun collection was a fully automatic assault rifle, an AK-47, which B.G. characterized as a "machine gun." B.G. also owned an AK-15 with various accessories. B.G. additionally was working on developing homemade silencers for his guns.

**B. Criminal Charges and Guilty Pleas Involving B.G.**

1. *December 16, 2014 assault.* On December 16, 2014, the tension between the spouses boiled over. Q.G. had a holiday program that evening. A.P. arrived home late from work. The spouses fought over laundry and unpaid bills. Nonetheless, A.P. and B.G. attended the holiday program, went out to eat with B.G.'s parents and their children, and returned home.

After they arrived home from the event, the argument escalated. A.P. decided to get her children into the car and leave the home but B.G. refused to allow her to leave. Q.G. had already fallen asleep in a downstairs bedroom but W.G. was in A.P.'s arms. A.P. went to Q.G.'s bedroom to assemble clothes so she and the children could leave the residence. When in Q.G.'s room, B.G. pushed A.P. and W.G. to the ground and punched the light bulb above them, causing shattered glass to fall on A.P. and W.G. B.G. began to strangle A.P., who ultimately was able to kick him in the groin and escape his grasp.

B.G. called his parents, who arrived at the home quickly. That night, B.G. threatened to kill himself, his parents, A.P., and the children. B.G.'s mother later told police she was scared for A.P. and the boys that night. She also stated she was considering calling 911 but decided not to do so because she feared when the police arrived, B.G. would harm himself. Ultimately, A.P., Q.G., and W.G. went to B.G.'s parents' home for the evening.

2. *December 26, 2014 assault.* Apparently, A.P., Q.G., and W.G. returned to the family home following the December 16 events. The family spent Christmas day at B.G.'s parents' home. When the family returned home the following day, an argument ensued. A.P. had some work at her office on December 26 and decided that instead of dropping

the boys off at the grandparents' home she would have a sitter look after them. B.G. became enraged, threw objects in the kitchen, and strangled her multiple times, leaving red marks on her neck. A.P. agreed to take the children to the grandparents' home but stopped at the police station to report the assaults of that day and of December 16. She also asked law enforcement to walk through the house and remove all weapons.

Local law enforcement conducted an investigation. During the walk through of the home, law enforcement officers seized a baggie containing methamphetamine residue. When interviewed by law enforcement, B.G.'s father stated B.G. "flips his switch and turns into a monster." B.G.'s father further told law enforcement B.G. was going to shoot him.

State authorities arrested B.G. A.P., Q.G., and W.G. checked into a safe hotel with the assistance of a crisis intervention center.

3. *State criminal charges: domestic assaults, child endangerment, possession of drugs.* The state originally charged B.G. with six charges: three felony counts of domestic abuse assault, one aggravated misdemeanor of child endangerment, one count of kidnapping in the second degree, and one count of possession of a controlled substance (methamphetamine).

B.G. pled guilty to four charges: two aggravated misdemeanor counts of domestic abuse assault, one aggravated misdemeanor count of child endangerment, and one serious misdemeanor count of possession of a controlled substance. He was sentenced on May 13, 2015, to the maximum prison sentence on each of the four counts, to be served consecutively, for a total of seven years in prison. The record before the district court reveals his tentative discharge date for his state crimes is

November 11, 2018, with a possible parole hearing in February 2017 and possible release in June 2017.[1]

4. *Federal criminal charges: guns and drugs.* B.G. also faced federal criminal charges. Although the original federal indictment was not part of the district court record, the plea bargain reveals that of the original charges, B.G. pled guilty to three counts of "Unlawful User of a Controlled Substance in Possession of a Firearm." *See* 18 U.S.C. § 922(g)(3) (2012). During the termination hearing, B.G. testified he knew he possessed a gun, a fully automatic AK-47, in violation of federal law. He further testified the silencers he was trying to make, but had not yet completed, would have given rise to federal offenses. According to B.G., the federal authorities told him the original federal charges would be fully prosecuted unless he pled guilty to the state charges. B.G. contended that without a plea bargain on the state charges he would have been looking at up to a forty-year sentence on the federal charges.

B.G. pled to the four state charges and the three federal counts. On January 19, 2016, the federal district court sentenced B.G. to forty-two months' imprisonment, with credit for time served on his state charges.

After sentencing in federal court, B.G. called A.P. He told her the sentence was her fault because the federal authorities brought up the domestic assaults and he now had a long time, in A.P.'s words, "to think about how he could destroy [her] and [her] family." B.G. admitted he told A.P. that he was going to attempt to expose what B.G. claimed was A.P.'s personal and professional misconduct and the fact that she "never did anything to help [him] get clean."

---

[1]The record does not include if or when B.G. was released.

### C. Postarrest Events.

1. *B.G.'s contact with Q.G. and W.G.* Prior to B.G. being turned over to federal authorities, B.G. was held in the Hancock County jail. On May 15, 2015, a visitation was arranged between B.G., Q.G., and W.G. at the jail. B.G. gave the children presents. W.G. was very young, however, and could not have received much benefit from the experience. Q.G. was older and seemed particularly to enjoy the presents provided by B.G.'s parents. This occasion was the last time B.G. had direct personal contact with Q.G. and W.G., who at the time were ages four and one.

Early in his incarceration, B.G. recorded audio books and signed cards for his children. These materials, however, were apparently not provided to the children but were kept by B.G.'s parents. B.G. wrote letters to his parents so there would be "documented proof of just how much [he] miss[ed] [Q.G.] and [W.G.]." He received photos of the children from his parents.

After the May 15 visit, periodic phone contact between B.G. and the children continued until late fall of 2015. The phone contact tapered off during this time, however, as B.G. became frustrated when A.P. began to tell him the children could not talk to him because of scheduling issues. B.G. stopped calling A.P. to arrange contact with the children in November, but instead called his parents when the children were with them until early 2016.

In February 2016, officials at the Iowa Department of Corrections advised A.P. that B.G. could not have contact with the children because they were registered victims of his crimes. Contact could resume once B.G. completed one-half of the recommended treatment. As a result, the department suspended B.G.'s contacts with Q.G. and W.G. The

department lifted these restrictions on November 17, 2016, just five days prior to the termination hearing at the district court.

A.P. consulted with medical providers regarding the effect on Q.G. and W.G. of contact with their incarcerated father. In April 2016, a licensed social worker counseled against face-to-face visits with B.G. while he was incarcerated. B.G. did not disagree with this recommendation. A.P. also testified Q.G. had episodes of diarrhea from September until December 2014. Q.G. was examined by physicians, including a specialist. Q.G.'s primary physician diagnosed stress induced irritable bowel syndrome. The diarrhea ceased in January 2015 after Q.C. no longer had contact with B.G. Q.G. had another diarrhea incident in May 2015 when a visit was arranged involving B.G. and Q.G. at the Hancock County jail. Diarrhea is not a current issue with Q.G.

2. *Relationship between B.G.'s parents and A.P., Q.G., and W.G.* B.G.'s parents wanted to continue their relationship with their grandchildren after the events of December 2014. Email records show at first the grandparents and A.P. frequently communicated, and A.P. arranged opportunities for contact with Q.G. and W.G., including overnight visits. In May 2015, six months after the December 2014 events, A.P. and the grandparents exchanged emails regarding how to facilitate a visit with B.G. and the children. After that event, the relationship between the grandparents and Q.G. and W.G. continued.

In July 2015, a hearing was held on the state's request to extend a no-contact order prohibiting B.G. from having any contact with A.P., Q.G., and W.G. The district court continued the no-contact order as to A.P. but not with regard to the children. The district court noted matters related to the children could be considered in the pending divorce action. After the hearing, A.P. sent an email to the grandparents stating, "I truly

do want you to have the same relationship with the boys." A month after the July hearing, A.P. petitioned the court to cancel the no-contact order in order for her to facilitate communication between B.G. and the children. The district court cancelled the no-contact order as requested by A.P.

At about the same time, B.G. wrote his parents expressing frustration with A.P. He told his parents that if his kids were taken away from him, "I'll have a vendetta with years of inspiration driving me. A lot of those feelings won't be good."

By spring of 2016, the relationship between the grandparents, A.P., and the children deteriorated. The change in relationship between A.P. and the grandparents began to occur shortly after the department informed A.P. that B.G. could not have contact with the children. A.P. was upset by a comment made by B.G.'s father to Q.G. that "mean people" were keeping B.G. from calling them. A.P. also heard rumors that B.G.'s mother told people that A.P. did not adequately help B.G. with his drug problem. A.P. also was concerned about a comment made by B.G.'s father to Q.G. that his real father was B.G., not J.P., A.P.'s new romantic partner. A.P. began not to respond to requests by the grandparents to see the children.

The grandfather wrote an email to A.P. dated July 25, 2016, stating a desire for peace and a desire to rebuild their relationship with the children. The email stated the grandparents visit their son every week. Further, the email told A.P.,

> I also know how he is prepared to "bring you down" should a "normal" relationship with his sons be denied him. He has a lot of ammunition stored on his phone—I've seen it. I pray that he never feels the need to use it against you, and we will continue to preach to him, daily if necessary, not to resort to that for revenge.

Upon viewing the above email prior to the termination hearing, the Hancock County sheriff had some concern B.G. might be a threat to the children. The "bring you down" quote in the grandfather's email was consistent with the statements made by B.G. to A.P. six months earlier after the entry of his federal sentence.

In the fall of 2016, A.P. contacted the Hancock County sheriff's office regarding the activities of the children's grandfather near their daycare center. A.P. asserted the grandfather was stalking the daycare center, often driving by multiple times in a single day. On one occasion, Q.G. entered the truck of the grandfather. These events did not result in any law enforcement action, however.

3. *Dissolution of marriage.* A.P. filed for dissolution of marriage in January 2015. In an order entered in May 2016, the district court approved a stipulation agreed to by the parties that dissolved the marriage, divided the couple's assets and liabilities, and established custody and visitation arrangements.

Of particular concern in this case is the parties' stipulation relating to custody and visitation. The parties stipulated A.P. would have sole legal and physical custody of the children. Further, the parties agreed to the following:

> The parties further and specifically agree that phone, mail, e-mail,[(offender email)] and visiting between the Respondent and the minor children will be considered by the Petitioner upon the Respondent being active in recommended treatment and/or full or partial completion of such programs as required by the Department of Corrections and their policy. The parties further agree that (1) if such contact is unreasonably withheld, or (2) if/when [B.G.] addresses treatment as by DOC policy required or (3) upon release from prison, the Court specifically reserves jurisdiction to consider modification of custodial/visitation provisions upon application by [B.G.] and affirmative demonstration of compliance with requirements and the children's continuing best interests.

Of particular note in the stipulation, the parties agreed that upon release from prison, the court reserved jurisdiction to consider modification of the custodial and visitation provisions upon application by B.G.

4. *A.P.'s new relationship, marriage, and stepfather's desire to adopt.* A.P. knew J.P. from high school. In January 2015, J.P. offered to move snow for A.P. Beginning in March, A.P., Q.G., and W.G. began living with J.P., with A.P. and J.P. splitting household expenses. J.P. is employed with an adequate income.

Since March 2015, J.P. has been actively involved in the children's lives, engaging in farm activities and snowmobiling with them, reading books together, and engaging in play with them. Q.G. and W.G. refer to J.P. as "Dad" or "Daddy." Q.G. and W.G. spend time with J.P.'s parents on the farm.

When depositions were taken in the termination proceeding, A.P. and J.P. noted their intention to be married. They were married a few days prior to the termination hearing. J.P. desires to adopt Q.G. and W.G. B.G. agrees J.P. is "a fine person to be around [his] children" but sees no reason why he cannot also be around the children as the biological parent.

5. *B.G.'s prison record.* B.G. had a good prison record. He had no major disciplinary infractions. He was invited to an awards banquet for model prisoners at the Fort Dodge Correctional Facility even though he had not resided in the facility for a full year—the usual applicable length-of-stay requirement for banquet participation.

In prison, B.G. participated in various programs. He voluntarily completed a fathering class. He regularly attended Narcotics Anonymous, receiving an award for 180 days of perfect attendance. At

the time of the termination hearing, B.G. had completed the "Achieving Change Through Value-Based Behavior" program, a forty-eight-hour program that includes anger management. B.G. had thus complied with all of the treatment requirements of the parties' stipulation in the divorce proceeding related to child custody issues. A minister who met B.G. after his arrest and who continued a relationship with B.G. after his incarceration developed favorable impressions about "the person B.G. had become."

B.G. testified at the termination hearing he may be released in June 2017. This date, however, may not include completion of his federal sentence and any requirements for residency in a halfway house. Upon release, B.G. testified he plans to live with his parents and has lined up a job with a local construction contractor. He thus will have a stable social and economic environment upon his release from prison.

**D. Termination Proceedings Under Iowa Code Chapter 600A.** On August 15, 2016, A.P. filed petitions to terminate the parental rights of B.G. to Q.G. and W.G. under Iowa Code chapter 600A. A.P. alleged three grounds for termination: abandonment, failure to support, and a crime against a child.[2]

B.G. resisted. In the district court, he asserted no grounds existed for termination and terminating his rights was contrary to the children's best interest. Additionally, B.G. characterized the termination of parental rights as "essentially a modification or change" in the custody decree, and there had been no changed circumstances warranting

---

[2]The termination petitions were filed four days after the district court filed a signed copy of the stipulation of the parties related to custody and visitation. The parties agreed to the stipulation months earlier, however, and the stipulation was approved in the district court order of May 25, 2016.

modifying the custody decree of the district court. It is thus not appropriate, he argued, to consider evidence of conduct occurring prior to the custody order. The district court appointed a guardian ad litem to represent the children.

A.P. and B.G. presented evidence at the termination hearing. In support of the petition, A.P. testified on her own behalf and called the Hancock County sheriff as a witness. B.G. testified in response. He called a high school secretary, a lay minister, a longtime friend and godfather of Q.G., and his parents.

After the close of evidence, the guardian ad litem filed a report with the court. The guardian ad litem recounted that she had interviewed Q.G. at home and B.G. by telephone, attended the deposition of A.P., and participated in the evidentiary hearing. Among other things and consistent with the testimony at the hearing, the guardian ad litem noted that Q.G. had some recollection of B.G. but had bonded with his stepfather, whom he referred to as "Dad." The guardian ad litem urged termination of B.G.'s parental rights was in the best interest of the children.

The district court found A.P. proved by clear and convincing evidence that grounds for termination existed for abandonment under Iowa Code section 600A.8(3) and for a crime against a child under section 600A.8(9). Most of the district court opinion addressed whether there was clear and convincing evidence termination was in the best interest of the children.

According to the district court, B.G. never contributed significantly to the financial costs of supporting the children. Even after the children were in daycare, B.G.'s work history was spotty, and his child support obligation while incarcerated was set to the minimal amount possible.

Further, although B.G. expressed an interest in his children while incarcerated, when he was living in the same house he was uninvolved with the children. The court found B.G. did not seek to exercise his parental rights while incarcerated in the ways that he was able given the incarceration, such as seeking the assistance of the court to reestablish phone contact with the children. Additionally, B.G. had not established and maintained a place of importance in the children's lives. The court found there was no evidence that B.G. could meet the children's physical, mental, and emotional needs, even after release from incarceration—citing B.G.'s recurrent drug use, his struggles to maintain employment, and his decision to consent to the termination of his parental rights with another biological child. The court also found that J.P. was a supportive father figure in the children's lives, which weighed in favor of termination of B.G.'s parental rights.

But the district court went into the most detail with respect to B.G.'s history with A.P. and his continued animosity toward her and denial of responsibility for the assaults. The court emphasized B.G. was clearly still enraged with A.P., blaming her for his drug use and incarceration. The court also described a few factors that were in B.G.'s favor, including his positive prison record, his access to support from family and friends, and the positive influence his parents have been in their grandchildren's lives. However, the district court ultimately concluded the termination of B.G.'s parental rights was in the children's best interest.

B.G. appealed the termination order, and we transferred the case to the court of appeals. The court of appeals held the termination of B.G.'s parental rights was in the best interest of the children, among other things. B.G. applied for further review, which we granted.

**II. Standard of Review.**

We review termination proceedings under Iowa Code chapter 600A de novo. *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998).

**III. Preliminary Issues Regarding Nature and Scope of Proceedings.**

**A. Introduction.** We first address preliminary issues raised by B.G. related to this appeal. B.G. seeks to limit the scope or significance of evidence considered in the termination proceeding under interrelated but not well-defined theories. First, B.G. asserts the district court could consider only evidence after the approval of the stipulation in the parties' divorce, which B.G. dates as beginning in May 2016, and the standards for modification of a divorce decree provide the proper standard for the district court to apply to these limited facts. Second, B.G. claims it would be inappropriate to relitigate issues which B.G. asserts were already determined in the divorce proceeding.[3]

**B. Application of Custody Modification Standards to Termination Proceeding.** In his briefing, B.G. argues the only evidence to be considered in this termination petition is evidence of events that occurred after the entry of the divorce decree in the district court. B.G. argues that when a district court establishes legal custody rights and responsibilities, physical placement, and visitation rights, a subsequent application for termination of parental rights "is essentially *an application*

---

[3]B.G. phrases this inappropriateness alternatively and at various points throughout the appeal and on further review, as whether the district court has the "authority" or the "jurisdiction" to hear the matter or to consider facts occurring prior to the stipulation. We do not view these as independent arguments, but rather as advancing the central premise that it was improper of the district court to decide that the best interest of the children required termination of B.G.'s parental rights when another district court had already considered the best interest of the children when it awarded custody in the dissolution of marriage proceeding.

*for modification* of the original decree." B.G. argues that under the applicable rules for modification of a divorce decree, there must be a change in circumstances not within the contemplation of the district court when the original decree was entered. *In re Marriage of Vetternack*, 334 N.W.2d 761, 762 (Iowa 1983).

A.P. rejects the argument. A.P. emphasizes the question of termination of parental rights is different from determination of custody issues in a divorce. A.P. notes, among other things, a district court in a divorce proceeding under Iowa Code chapter 598 does not have authority to terminate parental rights. A.P. cites Iowa Code section 600A.3, which provides "[t]ermination of parental rights shall be accomplished only according to the provisions of this chapter." According to A.P., nothing in Iowa Code chapter 600A.3 restricts the evidence to be considered.

In his reply brief on appeal, B.G. offered a somewhat different argument, namely, that the district court does not have exclusive jurisdiction of private termination actions. B.G. noted that while Iowa Code section 232.61 expressly provides the district court, sitting as a juvenile court, with exclusive jurisdiction of termination of parental rights cases brought by the state, there is no similar provision in Iowa Code chapter 600A.

The district court in this case, however, did not address these issues. As a result, the issues are not preserved for our review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("When a district court fails to rule on an issue properly raised by a party, the party who

raised the issue must file a motion requesting a ruling in order to preserve error for appeal.").[4]

## IV. Termination of Parental Rights Under Iowa Code Chapter 600A.

**A. Introduction.** Termination proceedings under Iowa Code chapter 600A are a two-step process. *See* Iowa Code §§ 600A.1, .8. In the first step, the petitioner seeking termination must first show by clear and convincing evidence a threshold event has occurred that opens the door for potential termination of parental rights. *Id.* § 600A.8. Once that threshold showing has been made, the petitioner next must show, by clear and convincing evidence, termination of parental rights is in the best interest of the child. *R.K.B.*, 572 N.W.2d at 602.

**B. Threshold Determination.** A.P. alleged termination was proper in this case because (1) B.G. had abandoned the children, (2) B.G. had been ordered to provide financial support to the children and failed to do so without good cause, and (3) B.G. had been imprisoned for a crime against a child. *See* Iowa Code § 600A.8. B.G. does not dispute, however, that he was incarcerated for a crime against one of his children. *See id.* § 600A.8(9). As a result, A.P. has met the threshold requirement

---

[4]To the extent B.G. is attempting to challenge the subject matter jurisdiction of the district court, we reject the challenge. The district court, sitting as a juvenile court, has exclusive jurisdiction over terminations under Iowa Code chapter 600A. *In re G.A.*, 826 N.W.2d 125, 127 (Iowa Ct. App. 2012). We see no reason to depart from that ruling.

In addition, although no party raised the question, we have held that the doctrine of judicial estoppel may be raised sua sponte on appeal. *See Tyson Foods, Inc. v. Hedlund*, 740 N.W.2d 192, 195 (Iowa 2007). In light of our disposition in this case, however, it is not necessary to consider whether to raise judicial estoppel on our own motion or whether the doctrine should be applied under the facts and circumstances of this case.

for private termination by clear and convincing evidence. It is thus not necessary for us to decide the abandonment or financial support issues.

### C. Best Interest of the Child.

1. *Applicable framework for determining the best interest of the child.* Iowa Code section 600A.1 provides a lengthy description regarding application of the concept of "best interest of the child" in termination proceedings. The provision states the best interest of the child "shall be the paramount consideration" in interpreting the chapter. *Id.* § 600A.1. Yet, the section further provides the interests of the parents of the child "shall be given due consideration." *Id.*

The best interest of the child requires each parent "affirmatively assume the duties encompassed by the role of being a parent." *Id.* Among other things, the court is directed to consider "the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life." *Id.*

In addition to applying the language of Iowa Code section 600A.1, we have also borrowed from Iowa Code section 232.116(2) and (3) to flesh out the best-interest-of-the-child test. *In re A.H.B.*, 791 N.W.2d 687, 690–91 (Iowa 2010). We consider the child's "physical, mental, and emotional condition and needs" and the "closeness of the parent-child relationship." Iowa Code § 232.116(2)–(3).

The best-interest-of-the-child test plainly has both backward-looking and forward-looking components. We have cited with approval a discussion of the court of appeals, which stated,

> We look to the child's long-range, as well as immediate, interests. We consider what the future holds for the child if returned to his or her parents. Insight for this determination

> can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care the parent is capable of providing. Our statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child.

*R.K.B.*, 572 N.W.2d at 601 (quoting *In re C.M.W.*, 503 N.W.2d 874, 875 (Iowa Ct. App. 1993)).

2. *Discussion.* In this case, in considering the best interest of the children, there are factors pointing in both directions. While our caselaw illuminates how these many factors may affect the balance in determining the best interest of the child, we have not adopted a formulaic or rule-bound approach. As a result, the caselaw has limited utility. Each case must be decided on its own facts.

There are factors that point toward termination. Certainly B.G.'s past conduct gives one pause. We have stated, for instance, that "[i]nsight for this determination [of the child's long-range best interest] can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing." *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981).

In this case, B.G. has a history of depression and suicidal ideation as a youth, two OWI convictions, and experimentation with meth at the age of twenty-four. Later, he developed an addiction to meth over a three-year period during which he was so incapable of providing parenting to his children that they were placed in daycare even though he was a stay-at-home father. During the period of his drug addiction, he possessed powerful weapons including a fully automatic AK-47 assault rifle and was working on assembling unlawful silencers. Ultimately, he pled guilty to four state criminal charges including two

counts of domestic assault involving strangulation of his spouse, one count of child endangerment, and one count of possession of methamphetamines. B.G. also pled guilty to federal weapons charges.

We also note B.G. has not fully taken responsibility for his actions. *See In re J.L.W.*, 523 N.W.2d 622, 624 (Iowa Ct. App. 1994), *overruled on other grounds by In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). He tends to deflect responsibility. In the termination hearing, B.G. claimed A.P. kept coming after him on December 16 and kicked him in the testicles, which caused him to shove back. He claimed he was only trying to prevent A.P. from driving off with the kids in the middle of the winter on bad roads. B.G. also minimizes the December 26 assault, testifying he and A.P. were struggling over a car seat and he pushed her away with his hand slipping from her neck to her shoulder. The district court found B.G.'s rendition of events not credible. On this point, we agree with the district court.

Some further minimization occurred after B.G. was sentenced in federal court. B.G. seemed to blame A.P. for his predicament because the federal prosecutors insisted he plead to the state charges. With respect to his weapons cache, B.G. testified A.P. purchased accessories for one of his guns and she bought the tools necessary to work on silencers.

B.G. also in the past has had issues with anger and thoughts of revenge that are troubling. In July 2015, he told his parents that if he did not have contact with his children, "I'll have a vendetta with years of inspiration driving me. [A lot] of those feelings won't be good." When he was sentenced in federal court, B.G. told A.P. that he would have time "to think about how he could destroy [A.P.] and [A.P.'s] family." The July 2016 email from B.G.'s father to A.P. shows that B.G. continued to

express that he was prepared "to bring [A.P.] down" if he was not restored to a normal relationship with his sons.

We give weight to the closeness of the parent–child bond. *A.H.B.*, 791 N.W.2d at 691. Here, it is clear that W.G. and B.G. have no meaningful bond because of W.G.'s extremely young age and limited exposure to B.G. Unlike W.G., Q.G. has some memory of his father. But B.G. overstates the quality of his involvement in the lives of the children. For the three-year period beginning ten months after the birth of Q.G., B.G. was taking methamphetamines. In order to avoid entangling the children in his drug use, Q.G. and W.G. were placed in daycare rather than in the care of their stay-at-home dad. The record further shows when A.P. returned home from daycare with the children, B.G. often left the residence.

Further, once arrested, B.G.'s contact with the children was limited to one in-person meeting, periodic phone calls, and for the ten-month period prior to the termination hearing, no contact at all. The general rule is that unavailability of a parent due to incarceration is no excuse for the lack of a meaningful bond. *In re R.L.F.*, 437 N.W.2d 599, 601–02 (Iowa Ct. App. 1989).

Another factor to consider is the fact that a stepfather is willing to provide for the children's needs and is willing to adopt the children. *See In re G.A.*, 826 N.W.2d 125, 131 (Iowa Ct. App. 2012). Indeed, in the period between March 2015 and the termination hearing in November 2016, J.P. surely has had a better opportunity to bond with Q.G. and W.G. than B.G in the period from fall of 2011, when he began using meth, until his arrest in December of 2014.

Although A.P. claims B.G. does not desire a relationship with his children, we do not think the record supports this particular contention.

Both A.P. and B.G. came to the reasonable conclusion it would not be a good idea for the children to visit B.G. in a prison setting. Immediately after his imprisonment, B.G. communicated by phone for a substantial period until A.P. appeared to present obstacles to such contact. Apparently, A.P.'s seeming evasiveness discouraged B.G. from continuing efforts to contact his children, which is to neither parents' credit. Eventually, in the period between February and November 2016, contact with the children was cut off by prison policy. B.G. cannot be blamed for this development. We think the record on the whole supports B.G.'s fervently stated interest in resuming a relationship with his children upon his release from prison.

There are other aspects of the record that point in favor of B.G.'s position. It is undisputed that B.G. has had a good prison record. He has not had any major behavioral problems and has completed prison courses involving parenting and anger management. He was rewarded for exemplary prison behavior by being invited to attend an offender banquet recognizing his prison conduct.

We have recognized that an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children. *See, e.g.*, *In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012); *In re J.K.*, 495 N.W.2d 108, 112–13 (Iowa 1993). In the dissolution decree, A.P. and B.G. agreed that contact between B.G. and the children would depend upon B.G. being active in recommended treatment and full or partial completion of programs required by the department of corrections. B.G. has complied with that requirement. In prison, his commitment to dealing with his drug problem is reflected in his perfect attendance at Narcotics Anonymous sessions for 180 days. He recognizes that he made poor decisions regarding the use of drugs and that his drug usage led to his current

predicament. B.G. appears to understand that he is a different person when on drugs and that he cannot successfully parent using them. Upon his release, he will be subject to parole supervision, including periodic drug testing.

B.G. also has an extended family willing to provide additional support for his parenting activities. *See Dale v. Pearson*, 555 N.W.2d 243, 246 (Iowa Ct. App. 1996) (noting family support is important in best-interest-of-children decisions). Our examination of the record reveals the grandparents of Q.G. and W.G. are loving, warm-hearted people who love their grandchildren but have been forced to deal with the extraordinarily difficult life situation posed by having a son addicted to methamphetamines.

Upon release, B.G. plans to live with his parents. Although B.G. has a checkered past with respect to employment, he has a job lined up with a local construction company upon his release. These arrangements indicate upon release B.G. will have a solid structure to support his reentry into society and to help avoid relapse.

We also note that shortly before the private termination proceeding was filed, the parties agreed to a stipulation that upon B.G.'s release from prison, the district court may consider terms and conditions of visitation between B.G. and the children. Although there have been some changes between the date the stipulation was signed and the filing of the termination petition, the desirability of allowing the recent stipulated agreement of the parties to play out before the district court is a factor to be considered.

On balance, we conclude A.P. did not show by clear and convincing evidence the best interest of the children will be advanced by termination of B.G.'s parental rights. Families come in all shapes and sizes, and the

prospect of B.G. having parental rights should not undermine the home that A.P. and J.P. have provided the children. It is clear B.G. loves his children and strongly desires to continue as their father. Although contact has been quite limited during the past few years due to B.G.'s incarceration, the children remain quite young and may benefit from years of exposure to their father upon his release from prison. B.G.'s loving, extended family offers the prospect of meaningful support for the children. Although B.G. has a history of serious drug problems and domestic violence, B.G. has regularly attended Narcotics Anonymous while in prison and understands his past failure as a parent was drug related. Upon release, he plans to live with his parents in a supportive environment and has lined up a job in construction.

Under the totality of circumstances, we are not ready to write off B.G.'s potential positive contributions to his sons' lives. We therefore conclude that A.P. has not proved by a clear and convincing preponderance of the evidence that B.G.'s parental rights should be terminated. We note, however, that any future relapse of involvement with drugs or violence may well tip the balance in any future termination action. *See In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) (noting reversion into old ways with respect to issues of domestic violence, alcohol, and drug use as factor in termination of parental rights).

### V. Conclusion.

For the above reasons, we vacate the decision of the court of appeals and reverse the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED.**

All justices concur except Hecht, J., who takes no part.