# IN THE COURT OF APPEALS OF IOWA

No. 17-2051
Filed July 5, 2018

**IN THE INTEREST OF A.L.,**
**Minor Child,**

**D.L., Father,**
Petitioner-Appellant,

**R.G., Mother,**
Respondent-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt, Judge.

A father appeals a district court ruling denying his petition to terminate the mother's parental rights under Iowa Code chapter 600A (2017). **AFFIRMED.**

Shayla L. McCormally of McCormally & Cosgrove, P.L.L.C., Des Moines, for appellant.

Daniel M. Northfield, Urbandale, for appellee.

Lori A. Bullock of Newkirk Zwagerman, P.L.C., Des Moines, guardian ad litem for minor child.

Considered by Danilson, C.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

A father appeals a district court ruling denying his petition to terminate the mother's parental rights under Iowa Code chapter 600A (2017). The father argues the district court erred in concluding there was not clear and convincing evidence to support termination under Iowa Code section 600A.8(3)(b) and termination is not in the best interests of the child.

## I. Background Facts and Proceedings

Upon our de novo review of the record, we make the following findings of fact. The mother and father met in 2009 and began dating. Their relationship produced the child in interest, born in February 2010. When the child was born, the parents were about sixteen years old, both were living with the child's maternal grandfather, neither was attending school or working, and both were regularly using drugs and consuming alcohol. Both parents have a history of engaging in criminal activity. At first, both parents cared for the child, with help from the maternal grandfather. A few months into the child's life, however, the father moved back in with his own father because "things just weren't going good between" him and the mother. After the parents discontinued their relationship, the maternal grandfather became the primary caregiver for the child. The father continued to have occasional visitation with the child at a minimum of once a month, sometimes more. The mother, on the other hand, conceded in her testimony she was not around the child very much in the first few years of the child's life.

In late 2012 or early 2013, the father discontinued his drug use. The father began a relationship with M.W.[1] in 2013 and the two moved in together "right away." For an approximate one-and-one-half year period from about late 2012 to early 2014, the mother was living with the child and the maternal grandparents and assisted in caring for the child. In the spring of 2014, the mother, according to her testimony, "ended up getting back on drugs," after which the mother "kind of just left," leaving the child with the maternal grandfather, "figur[ing] he would raise her." Thereafter, in April 2014, the child began living with the father and M.W. on a full-time basis. The child was four years old at this time, and the child and M.W. connected immediately. After the child began living with the father full time, the father and M.W., for a time, continued to have a good relationship with the maternal grandparents and allowed them to have visitation with the child.

In August 2014, the mother visited the father's residence and requested visitation with the child. According to the father's testimony, the mother was "strung out" on drugs. The mother asked the child if she wanted to leave with her, but the child stated she wanted to stay with her mom, referring to M.W. The father admitted in his testimony that he did not want the child to be around the mother. He expressly advised the maternal grandparents over the years that if the mother is present at their home, then he would not want the child to be there. After the August visit, the mother "didn't really try" to contact the father for visitation. The mother testified to her reasoning for the lack of contact as follows:

> I also knew that my parents said if I was around [the father] would
> not let [them] have [her]. So I stayed away. I was on drugs, and I

---

[1] The father and M.W. were married in August 2017, approximately one month before the termination trial.

felt like—I would never do drugs around my daughter, and I didn't want her to be around me when I was on drugs. So I stayed away.

    I felt like if I came back and tried, he would take me to court. And I was in no position to be in front of a judge being like, I want my daughter.

    . . . .

    . . . . Like I said, I was on drugs, and I didn't want her around that. It was my problem and I didn't get sober, and I didn't—and I didn't come and see her.

When asked why the mother chose to stay away from the child after August 2014, she further explained, "I believed it was the best thing . . . for her because I was on drugs and the best thing for my parents because if I was around, they wouldn't be able to see her." The mother had absolutely no contact with the father or child from August 2014 through April 2017.

In a number of instances in 2015 and the first half of 2016, M.W. sent text messages to the child's maternal grandmother, expressing her and the father's concern that the mother might try to come back into the child's life. The maternal grandmother generally indicated in her responses that there was no reason for concern, as the mother had not been around and was clearly not interested in being involved in the child's life.

The mother was arrested and jailed in August 2016 on a probation-violation charge. In September, after being released from jail, the mother began participating in court-ordered substance-abuse treatment. The mother's treatment focused on addiction and relapse prevention, co-dependency issues, support systems, and parenting skills. The mother's substance-abuse counselor reported when the mother "initially entered into treatment she was eager to reengage with her daughter, however after talking it over . . . it was decided that she would focus on her own recovery first before attempting to build a stronger bond with her

daughter." The counselor further opined the mother "has made great strides" in attaining all of her treatment goals. The mother was successfully discharged from her substance-abuse program in June 2017. During her participation in the treatment program, the mother submitted to thirty-two urine-analysis tests—she tested negative for drugs on each. The mother has been sober since her August 2016 arrest. Since attaining sobriety, the mother has obtained her GED, gotten a job, and regularly attends church.

In September 2016, the mother also began paying child support to the father. She continued to make regular payments through the time of the termination trial. In November 2016, the father discontinued allowing the maternal grandparents to have visitation with the child "[b]ecause [the mother] was around." Specifically, the father observed a picture on social media of the mother sitting on a couch in the maternal grandmother's home. The maternal grandmother testified she has not seen the child since the father observed this picture.

In April 2017, the mother contacted the father and requested visitation with the child. The father denied the mother's request. The mother then filed a custody action. Thereafter, in late May, the father filed a petition to terminate the mother's parental rights alleging the mother abandoned the child.

The child continues to live with the father and M.W., both of whom are gainfully employed and are doing a commendable job in raising this child. There are generally no concerns about the child's health, education, or overall well-being. The child identifies M.W. as her mother, and the two of them have a very strong bond. The guardian ad litem testified to her opinion that any reunification between the mother and child would be "very traumatic for the child." In her report, the

guardian ad litem recommended termination of the mother's parental rights, noting the child "has virtually no relationship with her biological mother" and the child indicated "she has no memory of her biological mother."

Following a termination trial in September 2017, the district court entered an order denying the father's petition, concluding the father failed to prove the statutory grounds for termination by clear and convincing evidence and termination was not in the child's best interests. As noted, the father appeals.

## II. Standard of Review

"We review termination proceedings under Iowa Code chapter 600A de novo." *In re Q.G.*, 911 N.W.2d 761, 769 (Iowa 2018). We give weight to the factual findings of the district court, especially those concerning the credibility of witnesses, but we are not bound by them. *In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010). Our paramount consideration is the best interests of the child, but we also give due consideration to the interests of the parents. Iowa Code § 600A.1.

## III. Discussion

"Termination proceedings under Iowa Code chapter 600A are a two-step process." *Q.G.*, 911 N.W.2d at 770; *see* Iowa Code §§ 600A.1, .8. "In the first step, the petitioner seeking termination must first show by clear and convincing evidence a threshold event has occurred that opens the door for potential termination of parental rights." *Q.G.*, 911 N.W.2d at 770; *see* Iowa Code § 600A.8. "Once that threshold showing has been made, the petitioner next must show, by clear and convincing evidence, termination of parental rights is in the best interest of the child." *Q.G.*, 911 N.W.2d at 770.

A.      Threshold Determination

The father petitioned for termination of the mother's parental rights on abandonment grounds. Section 600A.2(19) defines abandonment of a minor child as "reject[ing] the duties imposed by the parent-child relationship . . . , which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." Section 600A.8(3)(b), which concerns children who are six months of age or older at the time of the termination hearing, provides the following:

> [A] parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, *and* as demonstrated by any of the following:
>       (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
>       (2) Regular communications with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
>       (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

(Emphasis added.)

The statute expressly requires the establishment of two elements by clear and convincing evidence: (1) the parent has failed to maintain "substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means" and (2) the parent has failed to maintain sufficient contact with the child under one of the three alternatives listed in section 600A.8(3)(b)(1)–(3). *See* Iowa

Code § 600A.8(3)(b); *see also In re S.A.*, No. 17-0859, 2018 WL 1182889, at *2 (Iowa Ct. App. Mar. 7, 2018) (noting "the threshold element of 'substantial and continuous or repeated contact' is economic contributions" (quoting *In re K.W.*, No. 14-2115, 2015 WL 6508910, at *3 (Iowa Ct. App. Oct. 28, 2015))).

Although it is clear the mother contributed little, if any, support toward the child until she began paying child support in September 2016, no evidence was presented that this was unreasonable according to the mother's means. *See* Iowa Code § 600A.8(3)(b). Furthermore, the mother consistently paid child support in the year leading up to the termination hearing. Likewise, no evidence was presented that the amounts the mother was paying were unreasonable according to her means. The father failed to prove by clear and convincing evidence the first statutory element for termination.

We next consider the second element of section 600A.8(3)(b). The mother's inconsistent participation in the child's life that resulted from her drug use indeed causes one pause. But the record also reveals the father was insistent over the years that he did not want the mother to have any contact with the child. One could conclude the father's position was reasonable based on the mother's history. But, after her arrest, the mother picked herself up, dusted herself off, participated in substance-abuse treatment, started paying child support, became employed, and demonstrated her ability to obtain and maintain sobriety. After working on herself, the mother sought to reengage the child in April 2017, but the father disallowed the mother visitation.

The mother then sought to exercise her parental rights by filing a custody and visitation action. The father responded with a petition for the termination of

the mother's parental rights. Problematic are cases such as this where one parent has a history of conduct that might have satisfied termination of parental rights, but the other parent does not pursue termination until a time when the circumstances supporting abandonment, although previously prevalent, have waned in light of a parent's recent positive conduct. A finding of abandonment is an easier conclusion when the parent's positive conduct occurs only in response to a termination petition. Conversely, when the termination petition is forwarded only in response to a parent's positive conduct and seemingly genuine efforts to ameliorate prior deficiencies, an allegation of abandonment is more problematic because the trial of these issues must consider all the evidence, including recent history.

Upon our de novo review of the record, we conclude clear and convincing evidence does not support a finding that, at the time leading up to these proceedings, the mother was in a state of rejection of "the duties imposed by the parent-child relationship" or that she was "making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." Iowa Code § 600A.2(19).

Because the father failed to meet his burden on either of the statutory elements, the district court's denial of his termination petition was appropriate.

B. Best Interests of the Child

We choose to continue our analysis, however, in light of the supreme court's recent position on the best-interests issue in termination proceedings under chapter 600A. *See generally Q.G.*, 911 N.W.2d at 770–74. As noted, a termination

petitioner must show by clear and convincing evidence termination is in the best interests of the child. *Id.* at 770.

> Iowa Code section 600A.1 provides a lengthy description regarding application of the concept of "best interest of the child" in termination proceedings. The provision states the best interest of the child "shall be the paramount consideration" in interpreting the chapter. *Id.* § 600A.1. Yet, the section further provides the interests of the parents of the child "shall be given due consideration." *Id.*
>
> The best interest of the child requires each parent "affirmatively assume the duties encompassed by the role of being a parent." *Id.* Among other things, the court is directed to consider "the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life." *Id.*
>
> In addition to applying the language of Iowa Code section 600A.1, we have also borrowed from Iowa Code section 232.116(2) and (3) to flesh out the best-interest-of-the-child test. *In re A.H.B.*, 791 N.W.2d 687, 690–91 (Iowa 2010). We consider the child's "physical, mental, and emotional condition and needs" and the "closeness of the parent-child relationship." Iowa Code § 232.116(2)–(3).

*Id.* at 771.

In *Q.G.*, the supreme court concluded a mother met the threshold requirement for termination but failed to show by clear and convincing evidence the best interests of the children would be advanced by termination of the father's parental rights. *Id.* at 770–74. The court noted numerous factors weighing in favor of termination: the father's history of depression and suicidal ideation as a youth; his two convictions for operating while intoxicated; experimentation with and subsequent addiction to methamphetamine which rendered the father "so incapable of providing parenting to his children that they were placed in daycare even though he was a stay-at-home father;" "he possessed powerful weapons . . . and was working on assembling unlawful silencers;" he pled guilty to

federal weapons charges and "four state criminal charges including two counts of domestic assault involving strangulation of his spouse, one count of child endangerment, and one count of possession of methamphetamines;" he attempted to minimize, and declined to take any responsibility for, his actions; he possessed "issues with anger and thoughts of revenge that are troubling;" there was "no meaningful bond" between the father and one child and the other child only had "some" memory of the father; there was little to no contact between the father and children due to the father's incarceration; and a stepfather was willing to provide for and adopt the children. *Id.* at 771–73.

On the other side of the ledger, the court noted other aspects that weighed against termination: the father's interest in resuming a relationship with the children upon his release from prison, the father's "good prison record" and the fact that he "completed prison courses involving parenting and anger management," the father showed "a commitment to dealing with his drug problem," he "recognize[d] that he made poor decisions regarding the use of drugs and that his drug usage led to his current predicament," the father would be subject to parole supervision and drug testing upon his release from prison, the father had "an extended family willing to provide additional support for his parenting activities," and he secured employment to commence upon his release from prison. *Id.* at 773.

Under the totality of the circumstances, the supreme court was "not ready to write off [the father's] potential positive contributions to his sons' lives." *Id.* at 774. The court explained:

> Families come in all shapes and sizes, and the prospect of [the father] having parental rights should not undermine the home that [the mother] and [stepfather] have provided the children. It is clear

> [the father] loves his children and strongly desires to continue as their father. Although contact has been quite limited during the past few years due to [the father's] incarceration, the children remain quite young and may benefit from years of exposure to their father upon his release from prison. [The father's] loving, extended family offers the prospect of meaningful support for the children. Although [the father] has a history of serious drug problems and domestic violence, [he] has regularly attended Narcotics Anonymous while in prison and understands his past failure as a parent was drug related. Upon release, he plans to live with his parents in a supportive environment and has lined up a job in construction.

*Id.* Generally, due to the father's recent, positive conduct, the supreme court was willing to give him a second chance, but noted "that any future relapse of involvement with drugs or violence may well tip the balance in any future termination action." *Id.*

We find *Q.G.* compelling in this case, as the circumstances of the two cases are comparable. Although the mother's conduct prior to August 2016 is troubling, to say the least, she accepts responsibility for that conduct and recognizes that her drug use resulted in a disconnect between herself and the child. She has a desire to foster a relationship with her daughter, has begun financial support of the child, has demonstrated an ability to maintain sobriety, and has a positive support system to help her continue to maintain that sobriety. Under the totality of the circumstances, we, like the court in *Q.G.*, are not ready to write off the mother's potential positive contributions to this child's life. Although reentry of the mother into the child's life may come with some negative effects, we believe such effects to be outweighed by the mother's potential positive contributions to this child's life in the long term. We agree with the district court that the father has not proven by clear and convincing evidence that termination of the mother's parental rights would be in the best interests of the child.

IV.     **Conclusion**

For all the above reasons, we affirm the district court's order denying the father's petition to terminate the mother's parental rights.

**AFFIRMED.**