**IN THE COURT OF APPEALS OF IOWA**

No. 22-0726
Filed October 19, 2022

**IN THE INTEREST OF B.G.E.,**
**Minor Child,**

**R.E., Mother,**
    Petitioner-Appellant,

**K.P., Father,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Dubuque County, Thomas J. Straka, Associate Juvenile Judge.

A mother appeals the order dismissing her petition to terminate a father's parental rights under Iowa Code chapter 600A (2022).  **AFFIRMED.**

Kenneth P. Nelson of Nelson Law Firm, PLLC, Waterloo, for appellant mother.

Matthew W. Boleyn of Boleyn Law, P.C., Dubuque, for appellee father.

Jen Chase, Waterloo, attorney and guardian ad litem for minor child.

Considered by Ahlers, P.J., and Badding and Chicchelly, JJ.

**CHICCHELLY, Judge.**

A mother appeals the order dismissing her petition to terminate a father's parental rights under Iowa Code chapter 600A (2022). She contends termination is appropriate because she showed clear and convincing evidence that the father abandoned the child under section 600A.8(3)(a) and termination is in the child's best interests. We review her claim de novo. *See In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). Because we agree with the juvenile court that the mother failed to show the father abandoned the child, we affirm without reaching the question of the child's best interests. *See In re Q.C.*, 911 N.W.2d 761, 770–71 (Iowa 2018) (stating that proceedings under Iowa Code chapter 600A are a two-step process in which the petitioner must first show the ground for termination by clear and convincing evidence before the court considers the child's best interests).

**I. Background Facts and Proceedings.**

The mother and the father dated from March to May 2021. The mother informed the father she was pregnant that June. Although she expressed interest in placing the child for adoption, the father objected and stated his willingness to raise the child.

At the start of the pregnancy, the father sent the mother messages asking after her and seeking information about medical appointments. The mother responded sporadically at first before stopping altogether. From the lack of response, the father understood the mother did not want continued contact. Their last correspondence was in late August or early September. Around that time, the father filed a declaration of paternity with the Iowa's paternity registry. *See* Iowa Code § 144.12A (establishing a registry that allows putative fathers to claim

possible paternity of a child before the child's birth and no later than the date of the filing of a petition to terminate parental rights); *see also id.* § 600A.6(1) (stating those who file a declaration of paternity have a right to notice and an opportunity to be heard in termination proceedings brought under chapter 600A).

The child was born in January 2022 and placed with prospective adoptive parents. Two days later, the mother petitioned to terminate parental rights. The father learned of the child's birth more than one week later, and he received notice of the termination proceedings around the same time.

In February, the paternal grandmother emailed the mother's lawyer on the father's behalf, reiterating the father's opposition to adoption and seeking visitation between the father and the child during the termination proceedings. In March, the father attempted to get information about the child's prospective adoptive placement but received no response. That same month, the father had a DNA test that later confirmed his paternity.

The termination hearing was held at the start of April. After the hearing, the juvenile court dismissed the mother's termination petition. The court found the mother failed to show by clear and convincing evidence that the father abandoned the child. As a result, it did not consider whether termination was in the child's best interests. The mother appeals, arguing the father's abandonment of the child and the child's best interests require termination of the father's parental rights.

**II. Abandonment.**

The court may terminate parental rights of a parent who abandons a child. *Id.* § 600A.8(3). There is evidence of abandonment when a person "mak[es] no provision or mak[es] only a marginal effort to provide for the support of the child or

to communicate with the child" while having the ability to do so. *Id.* § 600A.2(20).

A parent abandons a child less than six months old by failing to (1) show a willingness to assume the child's custody of the child, (2) act promptly to establish a parent-child relationship, and (3) show commitment to the child through action. *See id.* § 600A.8(3)(a)(1). The court may consider the following in determining whether a parent has abandoned a child:

> (a) The fitness and ability of the parent in personally assuming custody of the child, including a personal and financial commitment which is timely demonstrated.
> (b) Whether efforts made by the parent in personally assuming custody of the child are substantial enough to evince a settled purpose to personally assume all parental duties.
> (c) With regard to a putative father, whether the putative father publicly acknowledged paternity or held himself out to be the father of the child during the six continuing months immediately prior to the termination proceeding.
> (d) With regard to a putative father, whether the putative father paid a fair and reasonable sum, in accordance with the putative father's means, for medical, hospital, and nursing expenses incurred in connection with the mother's pregnancy or with the birth of the child, or whether the putative father demonstrated emotional support as evidenced by the putative father's conduct toward the mother.
> (e) Any measures taken by the parent to establish legal responsibility for the child.
> (f) Any other factors evincing a commitment to the child.

*Id.* § 600A.8(3)(a)(2). A parent's subjective intent is immaterial and does not preclude a finding of abandonment. *See id.* § 600A.8(3)(c).

The juvenile court found the father's actions precluded a finding he abandoned the child:

> The child was less than three months of age at the time of the termination hearing. Based upon [the father]'s stated position from the moment he learned of [the mother]'s pregnancy (that he never wavered from) that he objected to adoption and requested placement of the child, and given his efforts to inquire about [the mother] during her pregnancy, request to attend hospital appointments, request

information regarding appointments/ultrasounds, register with the paternity registry, comply with DNA testing, and requesting contact with child, the court is unable to find the petitioner has established by clear and convincing proof that [the father] has abandoned the child as contemplated by section 600A.8(3)(a).

The court acknowledged that the father stopped trying to communicate with the mother during the pregnancy. But the court found it was reasonable for the father to do so because the mother "made it clear she wanted no further communication with him" and the father "did not want to engage in any conduct that could be perceived as harassing." It found the father's response was reasonable: "[The father] was aware there was a court hearing fast approaching which would allow him the opportunity to express his position. The court does not believe it should be held against [the father] that he chose to respect [the mother]'s privacy wishes." It also noted the mother's role in the lack of communication:

> [The mother] testified that she stopped responding to [the father] as it was not her responsibility to keep him informed and there were other means for him to inquire about his child, such as through her family members. The court does not believe it was reasonable or necessary for [the father] to seek out other family members to obtain basic information regarding his child.

The record supports the juvenile court's finding that the father acted reasonably when he stopped contacting the mother during the pregnancy, and we defer to the credibility finding implicit in that determination. *See* Iowa R. App. P 6.904(3)(g) (stating that the appellate court is not bound by the district court's factual findings but gives them weight, especially those involving witness credibility); *see also, e.g.*, *In re M.T.*, No. 20-1219, 2021 WL 210950, at *2 n.3 (Iowa Ct. App. Jan. 21, 2021) (deferring to the juvenile court's implicit finding on witness credibility); *In re J.D.*, No. 17-0862, 2017 WL 4050966, at *3 (Iowa Ct. App.

Sept. 13, 2017) ("[T]though there are no express credibility findings in the termination-of-parental-rights order, it is implicit the court, as the trier of fact, did not find the parents to be credible."). The mother's testimony made clear that she did not want contact with the father during the pregnancy.[1] She explained that in her last message exchange with the father, she told him what little information she received during an ultrasound:

> [H]e was bombarding me with questions. Why this? Why that? And asking me for the info that I don't know. And I said, I can't, so I just stopped. I stopped responding to him and stopped answering his messages, and was later informed that it's not my responsibility to keep him informed. If he wanted to know stuff, there are ways he can find out.
>      Q. So he was sending messages again via Facebook Messenger? A. Yes.
>      Q. And did you see what the text was on those, or do you have to open them up? A. Most of them I could see just by kind of pre-reading it. My phone gives me notifications and half the message. I could scroll down, if it's a five-line message, I can see the whole message without having to open it up. Most of his things were the same. How are you doing? That sort of thing. So I just, you know what? I don't have time for this. I've got enough going on, trying to take care of myself, trying to focus on keeping a job, while pregnant. My home life was going—my phone was going crazy, so I said, I'll just take care of it later, and I never answered his messages after that.

The father understood that the mother wanted no further contact. He explained that he "didn't want to intervene in her wanting to be left alone," nor did he want to push or stress her. The father was also concerned that the mother could report him to the police if he kept messaging her or showed up at her home:

---

[1] The father also asked to attend appointments with the mother, but the mother testified "there were a lot of restrictions" on who was able to attend those visits because of the COVID-19 pandemic. The mother admits she brought her sister with her to two ultrasound appointments, the only ones she could bring someone with her. She testified, "Had I been able to bring in more people, I gladly would have had [the father] there, but the doctor's office did not allow that."

"I didn't want to push any farther to make the situation worse. I figured that if I was never going to get anywhere, then the best thing would be just to wait until the baby was born." But although the father stopped contacting the mother, he preserved his rights by filing a declaration of paternity with the paternity registry.

Once the child was born in January 2022, the father's actions were limited by the speed of the termination proceedings. The mother petitioned to terminate parental rights two days after the child was born. Although the father was not yet aware of the child's birth, the child was already placed with prospective adoptive parents, who the father never received any information about.[2]

Still, the father showed an intent to personally assume custody of the child once he learned of the child's birth. At around the same time, the father received notice of the termination proceedings, with a scheduled hearing less than a month away. The father acted swiftly in applying for court-appointed counsel. The court denied the application on February 1,[3] and the father answered pro se two days later, contesting the petition. The father then contacted the guardian ad litem and set up a meeting with her. At that meeting, the father asked about seeing the child

---

[2] The mother faults the father for not asking for information about the prospective adoptive parents or the child. This argument recalls the mother's testimony that she was not responsible for keeping the father informed about the child because he could find things out from other family if he wanted to know. The juvenile court found her approach was not reasonable or necessary, and we agree. The mother's refusal to provide the father information impeded his relationship with the child. *See In re B.G.S.*, No. 03-1272, 2004 WL 359528, at *2 (Iowa Ct. App. Feb. 27, 2004) (per curiam) (noting the statute recognizes "there may be circumstances in which a parent seeks to prevent the other parent from establishing a parent-child relationship by including the phrase, 'while being able to do so'" in the definition of "to abandon a minor child" set out in Iowa Code section 600A.2(20)).

[3] The court granted a second application for court-appointed counsel on March 1.

and was told to contact the mother's attorney, which the father did through his mother the same day. At the February 24 hearing, the father was told he had to show paternity with DNA testing before visiting the child. The father responded by scheduling the DNA test the next day. The test result was returned the day before the termination hearing, preventing visitation. The father concedes he did not provide financial support during the pregnancy or after the child's birth, though his means of doing so before February appears limited. But the father testified that he has purchased items needed to care for the child, like a crib, clothing, a car seat, and a baby carrier.

The burden of showing the father abandoned the child falls on the mother. Because the evidence fails to meet that burden, we affirm the order dismissing the termination petition.

**AFFIRMED.**