# IN THE COURT OF APPEALS OF IOWA

No. 18-1442
Filed March 20, 2019

**IN THE INTEREST OF B.C.,**
**Minor Child,**

**H.C., Guardian,**
    Appellant.
_____

Appeal from the Iowa District Court for Story County, Stephen A. Owen, District Associate Judge.

A guardian appeals the district court's dismissal of his petition to terminate a mother's parental rights under Iowa Code chapter 600A (2018). **AFFIRMED.**

Joel T.S. Greer of Cartwright Druker & Ryden, Marshalltown, for appellant.

Larry Pettigrew of Pettigrew Law Firm, P.C., Ankeny, for appellee.

Heard by Doyle, P.J., and Mullins and McDonald, JJ, but decided by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Mark, guardian of B.C., appeals the district court's dismissal of his petition for termination of the parental rights of B.C.'s mother, Candace, under Iowa Code chapter 600A (2018), upon its conclusion termination would not be in the child's best interests. He argues the court's "best-interests determination was premised on an inaccurate account of the record and on an erroneous application of the law to the unique facts of this case."

I.      **Background Facts and Proceedings**

Upon our de novo review of the record, we make the following factual findings. Jesse and Candace were a married couple. Their marriage produced two children, B.C. and M.C.[1] On October 21, 2016, Candace shot and killed Jesse while he slept. B.C. and M.C. were in the next room at the time. Candace initially claimed it was an accident but ultimately confessed otherwise. She was arrested. The children went to live with their paternal grandfather, Mark, and his wife, LaRae. Initially, the children visited Candace in jail. Candace also kept in contact with the children by phone and written correspondence.

In December, Mark and LaRae were appointed as guardians of B.C. and M.C. B.C. has not had contact with Candace in person or over the phone since January 2017, shortly after the guardians were appointed. Around this time, Candace continued to make attempts to contact B.C. by phone, but B.C. ignored her calls and shortly thereafter got a new cell phone number, which no one provided to Candace. Candace discontinued her attempts to call B.C. in March.

---

[1] The record indicates M.C. has reached the age of majority.

Candace continued to send B.C. written correspondence through August, but her letters were not answered or returned.

In July, a jury found Candace guilty of voluntary manslaughter. In August, Candace was sentenced to an indeterminate term of incarceration not to exceed ten years. Candace was eligible for parole at the time of the termination trial, and her tentative discharge date is in May 2021. B.C. will reach the age of majority in November 2021. At the time of sentencing, B.C. and M.C. requested no-contact orders be entered; the sentencing court denied their request. However, in September 2017, a detective with the Ames Police Department sent a letter to Candace stating the following:

> I am writing on behalf of your children, [M.C.] and [B.C.]. They have asked me to inform you that they do not want any contact from you or your family in any form, which includes but is not limited to: face-to-face contact, written communication via letter, email, or text message, any phone contact, any contact via a social media platform, or any other form of communication or 3rd party contact. If you do contact them, you could face a criminal charge.

The detective sent similar letters to several of the children's maternal relatives. As a result of this letter, Candace discontinued her efforts at contacting the children. She was also unable to contact Mark and LaRae, as they are registered victims of her crime. While in prison, Candace has participated in seven classes relative to domestic violence, emotional support, and her behavior. She regularly attends a book club and church.

In April 2018, Mark filed a petition to terminate Candace's parental rights to B.C. for abandonment under Iowa Code section 600A.8(3)(b). Thereafter, Candace reinitiated contact with the children, discovering after receiving notice of the petition that she could not be prevented by law enforcement from contacting

her children. Trial was held in July 2018. The guardian ad litem (GAL) made no effort to contact Candace or her family during these proceedings.

B.C. was fourteen years of age at the time of trial. Mark testified B.C. is concerned if his mother is released from prison before he reaches the age of majority, he could be forced to live with her and have a relationship with her. LaRae testified B.C. is afraid of Candace and wants no contact with her. Both guardians unsubstantively testified termination would be in B.C.'s best interests. B.C. testified he does not want to be forced to see or have a relationship with Candace and, as a result of the October 2016 happenings, he does not want to have contact with her. He also unsubstantively testified termination of Candace's parental rights is in his best interests. B.C. meets with a therapist, but the therapist did not testify. Candace generally testified that if, upon her release, her children do not want her involved in their lives, then she would honor that desire. After the close of evidence, the GAL made a statement to the court in which he indicated B.C. is thriving, he is bonded with his guardians, he has a positive living environment in their home, and he is benefitting from regular therapy sessions. The GAL also related B.C.'s fear that his life might be "uprooted" if Candace is released from jail before he reaches the age of majority and B.C.'s decision to pursue termination of Candace's parental rights was made by him alone. For those reasons, the GAL took the position termination is in B.C.'s best interests. The same was reflected in the GAL report, which was admitted into evidence.

In August, the court entered a ruling dismissing the petition. The court found the evidence sufficient to conclude Candace abandoned B.C. within the meaning of Iowa Code section 600A.8(3)(b). However, the court found termination of

Candace's parental rights would not be in B.C.'s best interests. The court indicated its finding that B.C.'s desire to cut ties with Candace was influenced by the guardians' actions to undermine the parent-child relationship. The court also found B.C.'s desire to be the result of trauma he has not fully processed in his developing mind. The court concluded, "The case for termination supporting best interests is merely speculative." As noted, Mark appeals.

## II.     Standard of Review

"We review termination proceedings under Iowa Code chapter 600A de novo." *In re Q.G.*, 911 N.W.2d 761, 769 (Iowa 2018). We give weight to the district court's factual findings, especially when considering credibility of witnesses, but we are not bound by them. *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa Ct. App. 1998). Our primary consideration is the best interests of the child. Iowa Code § 600A.1(1); Iowa R. App. P. 6.904(3)(o); *In re C.A.V.*, 787 N.W.2d 96, 99 (Iowa Ct. App. 2010).

## III.    Analysis

"Termination proceedings under Iowa Code chapter 600A are a two-step process." *Q.G.*, 911 N.W.2d at 770.

> [T]he petitioner seeking termination must first show by clear and convincing evidence a threshold event has occurred that opens the door for potential termination of parental rights. Once that threshold showing has been made, the petitioner next must show by clear and convincing evidence termination of parental rights is in the best interest of the child.

*Id.* (citations omitted). Because the district court found by clear and convincing evidence that a threshold event—abandonment—occurred, the sole issue on

appeal is whether clear and convincing evidence supports a conclusion that termination of Candace's parental rights is in B.C.'s best interests.

The burden to provide clear and convincing evidence at all times rests with the petitioner. *See id.*; *R.K.B.*, 572 N.W.2d at 602.

> Clear and convincing evidence is more than a preponderance of the evidence and less than evidence beyond a reasonable doubt. It is the highest evidentiary burden in civil cases. It means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence.

*In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016) (citations omitted). This heavy evidentiary burden is imposed "to minimize the risk of an erroneous deprivation of the parent's fundamental liberty interest in raising his [or her] child." *Id.*

The best interests of the child is the "paramount consideration" in chapter 600A proceedings, but the interests of the parent is also to be given "due consideration." Iowa Code § 600A.1(1).

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

*Id.* § 600A.1(2). In determining what is in a child's best interests, we also borrow from Iowa Code chapter 232 and "consider the child's 'physical, mental, and emotional condition and needs' and the 'closeness of the parent-child relationship.'" *Q.G.*, 911 N.W.2d at 771 (quoting Iowa Code § 232.116(2), (3)).

"The best-interest-of-the-child test plainly has both backward-looking and forward-looking components." *Id.*

> We look to the child's long-range, as well as immediate, interests. We consider what the future holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care the parent is capable of providing. Our statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child.

*Id.* (quoting *R.K.B.*, 572 N.W.2d at 601).

First, Mark contests the district court's conclusion that he and LaRae undermined the relationship between B.C. and Candace, arguing "the record does not support such a conclusion." Upon our de novo review of the record and giving deference to the district court's factual findings, we disagree. There is ample circumstantial evidence in the record to support the district court's conclusion. "Direct and circumstantial evidence are equally probative." Iowa R. App. P. 6.904(3)(p). We do not, however, rely on that evidence in reaching our conclusion.

Mark forwards the following considerations to support his position termination is in B.C.'s best interests: (1) the "crime was committed in a callous, intentional, and horrific manner"; (2) the children were in the next room when this "horrific act" occurred; (3) Candace "admitted she did not give any consideration to her children when she committed this act"; (4) B.C. "suffers from horrible anxiety and regresses into a state of turmoil at the mere discussion of" Candace; and (5) B.C. is fearful of Candace "and there is a major concern that everything will be uprooted if she is released from prison before he is eighteen." Mark goes on to

argue termination "will substantially enhance" B.C.'s "emotional and physical well-being" and failure to terminate would jeopardize his safety.

As to the first two considerations, Mark essentially argues Candace's killing of Jesse necessitates termination of her parental rights. However, there was very little evidence presented in this case concerning the circumstances of the crime, other than the vague facts that Candace shot Jesse while he slept and the children were in the next room. We do know that Candace was convicted of voluntary manslaughter, but that signals to us that this was a crime of passion resulting from serious provocation. *See* Iowa Code § 707.4 (2016). The fact that this was a crime of provocation additionally dilutes the argument that termination is in B.C.'s best interests because Candace "did not give any consideration to her children when she committed this act." Although we acknowledge that B.C. is bonded with his guardians, is thriving in their care, and suffers from anxiety as a result of his mother's crime and his fear of having to have a relationship with her upon her release from prison, the only other evidence in the record that termination would be in B.C.'s best interests is derived from B.C.'s desire to no longer have a relationship with his mother and generally unsubstantive testimony by the witnesses that termination would serve his best interests.

Based on the evidence presented by Mark, he was essentially asking the district court to terminate Candace's rights solely because of the circumstances of the crime—while providing very limited information about the same—and because termination is what B.C. desires. The question becomes, should a fourteen-year-old child's wishes be dispositive on the best-interests issue? That is obviously a

question that should be answered on a case-by-case basis. The district court answered the question in this case as follows:

> [B.C.] is 14 years of age; he is in counseling; and he continues to process the tragic loss of his father and ultimately the loss of his mother too. In short, [B.C.] is a developing adolescent struggling with the traumatic loss of his parents. The Court considers his desires, but they are offered in the context of a developing adolescent who has suffered significant emotional trauma requiring ongoing therapy. So, his emotional state is not necessarily fixed and subject to change over time as he continues to receive counseling and as he continues to develop into adulthood. Again, the Court considers [B.C.'s] request for termination of his mother's parental rights, but does not find it to be dispositive.

As a result of B.C.'s adolescence and the trauma he suffered, the court generally concluded B.C.'s desire, which was the cornerstone of Mark's case, should not control. The court continued:

> The court does not find that termination of parental rights is in the child's best interest. The mother committed a horrific act. Her ability to atone for that in the parent-child relationship has been significantly undermined by the petitioner. The undermining of the relationship has resulted the child desiring to have his mother's parental rights terminated. His desire however is the result of trauma that he [has] not fully processed in his developing mind. The termination of the mother's parental rights serves no other purpose than the elimination of her fundamental right to parenthood and nothing in this record suggest[s] that will lead to any greater outcomes for the child. The evidence does not support that termination will substantially or materially enhance or detrimentally [a]ffect the child's emotional, social, economic, or physical well-being or that failure to terminate would result in danger or harm to the child. The case for termination supporting best interests is merely speculative.

The district court had the opportunity to observe the witnesses and judge their credibility as they testified. The court then gave a thoughtful, reasoned analysis. We defer to the district court's factual findings and note the very limited evidence presented in this case. The clear-and-convincing-evidence standard is the highest evidentiary burden in a civil case. *M.S.*, 889 N.W.2d at 679. To meet that standard

would require us to conclude Mark proved there would be "no serious or substantial doubt about the correctness of a . . . conclusion drawn from the evidence" that it would be in B.C.'s best interests to terminate the parental rights of his mother. *Id.* Based on the limited evidence presented we agree with the district court that Mark did not carry that evidentiary burden.

Consequently, we affirm the court's ruling dismissing Mark's termination petition.

**AFFIRMED.**