# IN THE COURT OF APPEALS OF IOWA

No. 19-0636
Filed November 27, 2019

**IN THE INTEREST OF S.P.,**
**Minor Child,**

**T.R., Father,**
        Petitioner-Appellee,

**J.P., Mother,**
        Respondent-Appellant.
_____

Appeal from the Iowa District Court for Dubuque County, Thomas J. Straka, Associate Juvenile Judge.


The mother appeals the termination of her parental rights in an Iowa Code chapter 600A (2018) private termination proceeding. **REVERSED AND REMANDED.**


Taryn R. McCarthy of Clemens, Walters, Conlon, Runde & Hiatt, L.L.P., Dubuque, for appellant.

Bridget L. Goldbeck of Hughes & Trannel, P.C., Dubuque, for appellee.

Matthew W. Boleyn of Reynolds & Kenline, L.L.P., Dubuque, guardian ad litem for minor child.


Considered by Vaitheswaran, P.J., and Potterfield and Greer, JJ.

**POTTERFIELD, Judge.**

The mother of twelve-year-old S.P. appeals from the termination of her parental rights in a private action brought by the father. The mother challenges the district court's determinations she abandoned S.P., pursuant to Iowa Code section 600A.8(3)(b) (2018), and that termination of her parental rights is in S.P.'s best interests.

**I. Background Facts and Proceedings.**

S.P. was born in July 2007 with THC in her system. The mother was sixteen years old at the time. The father was twenty-one. Immediately following S.P.'s birth, the Iowa Department of Human Services (DHS) became involved in S.P.'s and the mother's lives; the father was absent.

The mother had issues with drug use off and on for a number of years, and DHS was involved with the mother and S.P. on a voluntary basis four different times. Then, in May 2013, S.P. was removed from the mother's care and placed with a maternal uncle and aunt.[1]

The mother was incarcerated from November 2013 until July 2014. She sent letters and drawings to S.P. during this time.

The father did not have any sort of regular contact with S.P. until February 2014, after he was contacted by the Foster Care Review Board. S.P. and the father began having short supervised visits and quickly transitioned to spending

---

[1] The mother also had another child, S.P.'s younger brother, with a different father. DHS removed both S.P. and the younger brother from the mother's care in May 2013, and the mother's parental rights to the younger brother were eventually terminated in a chapter 232 termination proceeding. The maternal uncle and aunt adopted S.P.'s younger brother.

more time together. In summer 2014, as S.P. was turning seven, S.P. was placed in the father's full-time care.

The issue of custody of S.P. moved to the district court, and the DHS case closed. In May 2016, the district court entered an order giving the mother and father joint legal custody of S.P., placing S.P. in the father's physical care, and providing the mother a minimum of two one-hour supervised visits with S.P. each week.

The mother, who had to pay professionals to supervise her visits with S.P., consistently saw S.P. from November 2016 until September 2017.

The mother scheduled a visit with S.P. in October 2017, but then the father said it had to be rescheduled because S.P. already had plans with the father's family at that time. According to the mother's testimony, she misunderstood and believed the father was denying her future visits with S.P. because the mother was behind on her court-ordered child support. The mother did not contact the father, stepmother, or the woman who had been supervising visits from October 2017 until July 2018.

In May 2018, the father came upon one of the stepmother's children sexually abusing S.P. The father and stepmother contacted DHS, and the perpetrator was removed from the home and placed in sex offender treatment.

The mother made contact with the stepmother and DHS[2] in July 2018 after she learned about the incident. A visit between the mother and S.P. was scheduled for August, but the father cancelled it after S.P.'s therapist questioned

---

[2] The father testified that none of the mothers of his children have his cell phone number. He also testified that he has blocked the mother on Facebook.

whether a face-to-face visit should be the first type of contact following the mother's absence.

The father filed the petition to terminate the mother's parental rights in October.

In order to assuage the therapist's concerns about visits, the mother called the therapist and then, at the therapist's request, met with her three separate times. The therapist then set up a phone call, which took place in December. The therapist participated in the call with S.P. The therapist thought the phone call went well, and the mother and S.P. had two face-to-face visits in the therapist's office in January 2019.

The termination trial took place over two days, February 5 and 21.

S.P.'s therapist, who had been seeing her since July 2018, testified on the first day of the trial. She testified that, although she initially began meeting with S.P. to help her process the sexual assault, S.P. had generally used their sessions to talk about her mother. The therapist reported that S.P. had expressed numerous times that she wanted to see her mother. When asked, the therapist opined that the mother "is someone that's very important to [S.P.] in her life. . . . I definitely think she needs interaction with her mom. I don't think terminating rights would be beneficial for [S.P.]"

The father also testified at the trial. He had recently married the stepmother, with whom he had been in a relationship approximately six years, and shares one biological child with her. He otherwise has seven other children by four other mothers. The stepmother has four other children of her own—for a total of twelve children in the blended family. The father does not have visits with

his oldest two children,[3] and the stepmother's oldest child is in sex offender treatment following his sexual abuse of S.P. in the father's home. The remaining nine children spend at least some of their time in the father and stepmother's home. The father admitted that he remains $8000-$10,000 behind in his child-support obligations.

The father testified he decided to file the petition to terminate the mother's parental rights because he was tired of seeing S.P. be hurt by the mother's lack of consistency. Both he and the stepmother testified that if the mother's parental rights are terminated the stepmother would adopt S.P. Similarly, the father intended to adopt those of the stepmother's biological children who did not have another stable parent to take over their care if something happened to the stepmother. Both the father and stepmother also testified they told S.P. that once she became mature enough to make the decision for herself, she would still be able to be part of her mother's life if she wished.

During the stepmother's testimony, she stated that even if she and the father severed their relationship at some point in the future, she was committed to caring for and being a parent to S.P.

The mother testified as well. She stated she had not consumed heroin in six years, pain medication in three years, or marijuana in a little over one year. The mother was living with her parents, and her brother also lived in the same

---

[3] The father testified he did not have "any kind of relationship" with his two oldest children until approximately one year before the termination trial, which took place in February 2019. As of February 2019, they would "talk on Facebook or pretty much online-type stuff." There had not yet been any visits with the children, who were then sixteen and fourteen years old.

home. The mother was taking prescription medication for her diagnoses of anxiety, depression, and attention deficit disorder and had been consistently on her medication for eight or nine months. She had recently completed a month-long course to be a mental health technician and was trying to get a job. The mother testified her child-support obligation—set by the May 2016 custody order—was $50 per month; she was behind in payments approximately $750, but she had been making her payments for about a year. She emphasized she was not pursuing a change in custody for S.P. and understood S.P. was doing well in her father's home; but the mother wanted to keep her rights to S.P. and work toward increased time with the child. She testified she had made positive changes in her life, was getting her priorities straight, and was not on probation.

In its written ruling, the district court found the mother had abandoned S.P. pursuant to section 600A.8(3)(b) when she "made no effort to contact [the father], his wife, or the child in approximately ten months"—from October 2017 to July 2018. The court noted the mother's absence "added to the child's emotional trauma and anxiety" and the stepmother had "stepped into the role of a full-time mother figure to the child" and intended to adopt S.P. if the mother's rights were terminated." The court considered the therapist's testimony indicating she did not think termination of parental rights would be beneficial to S.P. but questioned whether the therapist had spent enough time with S.P. to fully understand the family's history. Ultimately, the court concluded S.P.'s "mental and emotional condition supports termination" of the mother's parental rights and determined termination is in S.P.'s best interests.

The mother appeals.

**II. Standard of Review.**

We review chapter 600A termination proceedings de novo. *In re G.A.*, 826 N.W.2d 125, 127 (Iowa Ct. App. 2012).

**III. Discussion.**

"Termination proceedings under Iowa Code chapter 600A are a two-step process." *In re Q.G.*, 911 N.W.2d 761, 770 (Iowa 2018). "In the first step, the petitioner seeking termination must first show by clear and convincing evidence a threshold event has occurred that opens the door for potential termination of parental rights." *Id.* "Once that threshold showing has been made, the petitioner next must show by clear and convincing evidence termination of parental rights is in the best interest of the child." *Id.*

Here, the father's petition alleged the mother's rights should be terminated under a number of different grounds, but the district court only found termination to be appropriate under section 600A.8(3)(b) (abandonment). It provides:

> For the purposes of this subsection, a parent is deemed to have abandoned a child as follows:
>     . . . .
>     b. If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
>     (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
>     (2) Regular communication with the child or with the person having the care or custody of the child, when physically and

financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.[4]

Iowa Code § 600A.8(3).

We agree the mother abandoned S.P. pursuant to the statutory definition. The mother argues she did not abandon S.P. because once she learned S.P. had been sexually assaulted, the mother reached out to S.P.'s caretakers. Additionally, she relies on the affirmative steps she took between July 2018 and the termination trial in February 2019 to reinitiate contact between herself and S.P. But these actions do not undo the approximately ten months the mother absented herself from S.P.'s life. A parent has abandoned their child unless they maintain, at a minimum, "at least monthly" visits with the child, Iowa Code § 600A.8(3)(b)(1), or "regular communication" with the person caring for the child, *Id.* § 600A.8(3)(b)(2). The mother's more-recent actions cannot undo her earlier abandonment of the child.

They do, however, inform our decision of whether termination of the mother's parental rights is in S.P.'s best interests. *See, e.g.*, *In re C.H.*, No. 16-0926, 2016 WL 7393956, at *2 (Iowa Ct. App. Dec. 21, 2016) (affirming district court decision to not terminate father's rights because, although father had abandoned the child, termination was not in the child's best interests due to the father's "sincere desire to be actively involved in the child's life"). We acknowledge the father and stepmother's desire to have the stepmother adopt S.P. *See Q.G.*, 911 N.W.2d at 772 ("Another factor to consider is the fact that a

---

[4] It is undisputed section 600A.8(3)(b)(3), which involves a parent who has lived with the child for six months within the one-year period immediately preceding the termination hearing, does not apply here.

[stepparent] is willing to provide for the child[]'s needs and is willing to adopt the child[]." ) But "[f]amilies come in all shapes and sizes, and the prospect of [the mother] having parental rights should not undermine the home that [the father and stepmother] have provided" S.P. *Id.* at 774. The mother's desire and stated commitment to maintaining a relationship with S.P., plus S.P.'s therapist's opinion that S.P. "needs interaction" with the mother, convinces us that termination of the mother's parental rights is not in S.P.'s best interests. We do not minimize the harm the mother caused S.P. when she removed herself from S.P.'s life, and we appreciate that future lack of consistency on the mother's part could be detrimental to S.P. But S.P. and her mother have a strong foundational relationship and S.P. can still benefit from her relationship with the mother in the future. *Cf. id.* (reversing termination of father's parental rights even though he did not have a "meaningful bond" with the younger child and was still incarcerated because the court was "not ready to write off [the father's] potential positive contributions to his" children's lives). We find the father's history instructive. The father abandoned S.P. for the first six years of her life, and now, by all accounts, he is a stable and caring parent, who S.P. benefits from having in her life. We believe the mother can make the same turnaround. Moreover, while the mother cannot undo her abandonment of S.P., the fact that she re-initiated contact on her own, before the termination petition was filed, encourages us that she has recommitted herself to being a parent to S.P. *Cf. In re C.D.*, No. 17-1740, 2018 WL 4923132, at *1–2 (Iowa Ct. App. Oct. 10, 2018) (finding termination in the child's best interests where the mother "did nothing to reinitiate

visits after the father declined to facilitate them" for years before the father filed the termination petition).

## IV. Conclusion.

Because termination of the mother's parental rights is not in S.P.'s best interests, we reverse the district court decision terminating the mother's parental rights and remand for dismissal of the father's petition.

**REVERSED AND REMANDED.**

Vaitheswaran, P.J., concurs; Greer, J., dissents.

**GREER, Judge** (dissenting).

I respectfully dissent with the majority opinion. I would affirm the district court ruling that terminated the mother's parental rights. The behaviors of this mother more closely align with the case facts found in our court's decision in *In re C.D.*, No. 17-1710, 2018 WL 4923132 (Iowa Ct. App. Oct. 10, 2018). Like this case, that mother stopped all visits with the child, made no efforts for any other contact doable under her then-current financial means, and took no action to rectify the situation. *C.D.*, 2018 WL 4923132, at *1–2. As a result, we found termination of parental rights in the child's best interests, and we affirmed the termination. *Id.* at *2.

Most troubling, the record here contains no explanation for the mother's disappearance from S.P.'s life for over ten months.[5] Yet the mother testified that over the previous two years she was nearby, working for her brother in a neighboring county. As an excuse for failure to remain connected, the mother concocted the story that her failure to pay child support was the issue. Yet she admitted no one told her that her child-support arrearage related to visitation rights. And while the child and mother clearly love each other, abandonment carries a heavy toll.[6] Witnesses testified the missing-mother situation created anger, anxiety, and emotional issues for the child. To extend that history is not in the best interests of this child.

---

[5] At the time of the last visit in September 2017, a counselor supervised the visits and the mother was required to institute the visitation sessions. The mother abruptly stopped all contact with the counselor even though four dates for visitation were already established for October and November 2017.

[6] S.P. asked the current counselor to not tell her about upcoming scheduled visits since she "doesn't want to be let down if mom doesn't show up."

Moreover, the record lacked proof of stability of the mother but showed evidence of instability. Once connected with the Iowa Department of Humans Services (DHS) in July 2018 to address the abuse situation of S.P., this mother failed to cooperate with DHS to provide a drug test. Because of her past, drug usage remained a serious concern. Then, she failed to respond to text messages or calls from the worker after the September 2018 meeting. That lack of response corresponded with discussions about drug use and requests to test. Finally, I cannot help but consider the ramifications to SP's stability if something happens to her father and custody follows to the mother. The stepmother seeks to adopt, and stability is favored over the risks remaining with the mother's choices.

I, too, give credence to the child's counselor's opinions related to the termination, but she only saw the mother three times, including only two occasions where the mother and child interacted. Likewise, after the September meeting, the mother failed to contact the child's counselor again until the end of November—again with no explanation. Despite the view about termination, the counselor cautioned, "I don't know how long [mother] needs to show that she can be consistent and can prove herself." The trial court also had the advantage of evaluating the counselor's conviction favoring reunification and the creditability of the mother.

> A trial court . . . "is greatly helped in making a wise decision about the parties by listening to them and watching them in person." In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented.

*In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (quoting *In re Marriage of Callahan*, 214 N.W.2d 133, 136 (Iowa 1974)).

Here, the mother failed to champion a strong justification for her lack of effort. As an example, she testified:

> Q. From January of 2018 up until you contacted [the stepmother] via Facebook in about July of 2018, did you attempt to see [S.P.]?
> A. I can't quite fully put my finger on it, but I know I wanted to.

Influenced by the mother's demeanor and failure to address the historical behaviors leading to the abandonment, the trial court correctly noted "the best predictor of the future is past behavior." *See In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992) ("Evidence of the parent's past performance . . . may show the quality of future care the parent is capable of providing.").

The mother has not answered the uncertainty about her follow through on visits, and S.P. remains emotionally stressed about the consistency of visits. While S.P. loves her mother and her mother loves her, harmful behavior of abandonment mitigates against continuing this pattern of coming and going. The witnesses testified that S.P. is sad and cannot process why her mother was not involved. She is worried about whether the mother has been harmed. The testimony suggested that insecurity may lead to issues with self-esteem, stability, and up-and-down emotions. Based upon all of these factors, I dissent and would affirm the trial court's ruling on termination of mother's parental rights.