# IN THE COURT OF APPEALS OF IOWA

No. 19-0915
Filed September 2, 2020

**IN THE INTEREST OF G.H. and R.H.,**
**Minor Children,**

**N.H., Mother,**
    Petitioner-Appellee,

**J.H., Father,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Adams County, Dustria A. Relph, Judge.

A father appeals the termination of his parental rights under Iowa Code chapter 600A (2019). **AFFIRMED.**

Joel E. Fenton of Law Offices of Joel E. Fenton, PLC (until withdrawal), Des Moines, and Amanda M. Demichelis of Demichelis Law Firm, Chariton, for appellant father.

David L. Jungmann of David L. Jungmann P.C., Greenfield, for appellee mother.

Kara L. McClure of Bergkamp, Hemphill & McClure, P.C., Adel, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge.**

A father appeals the termination of his parental rights to two children under Iowa Code chapter 600A (2019). He argues the mother's evidence was "inconsistent and inconclusive." To the contrary, we find clear and convincing evidence in the record to support termination of the father's parental rights.

## I. Facts and Prior Proceedings

Natalia and Jeffrey started dating in high school. Soon after graduation, Natalia moved into an apartment with Jeffrey in Creston. She pursued a nursing degree at Southwestern Community College. The couple continued to live together as Natalia started working as a nurse.

Jeffrey took a different path. According to Natalia, he started using marijuana and hanging out with the wrong crowd. Their relationship deteriorated to a point where Natalia considered ending it. But she stayed after G.H. was born in September 2011. In the same time frame, Jeffrey suffered setbacks. He received a conviction for second-offense operating while intoxicated. And Natalia noticed Jeffrey experienced mood swings that became more apparent and unpredictable. He would engage in verbal and physical disputes with Natalia. His feeble employment history worsened as his employers routinely let him go. Because Jeffrey could not keep a job, Natalia, by default, became the sole breadwinner for the family.

Because of pressure from Natalia's family, the couple married at the courthouse in September 2013. Their second child, R.H., was born in February 2014.

Unable to afford daycare, Natalia left the children in Jeffrey's care while she was at work during the day. But he neglected his duties. Upon her return from work, Natalia would catch Jeffrey sleeping. The children were "filthy" with unchanged diapers. Natalia testified that she suspected Jeffrey was doing drugs while the children were in his care. She once saw a baggie containing a "crystally substance" on the kitchen floor. Another time, while Jeffrey slept on the couch a "meth pipe rolled out of his pocket." In the fall of 2015 Natalia confronted Jeffrey and he confessed to using methamphetamine for the past five years.

Natalia also testified that based on her training as a nurse, she identified behaviors that supported her belief that Jeffrey had mental-health issues. Jeffrey would sometimes be "extremely energetic and sometimes euphoric" while other times he would be "extremely depressed and agitated." She repeatedly urged him to seek professional help, but he refused. According to Natalia, Jeffrey was physically abusive towards her at least three times. She recalled one instance when Jeffrey punched her in the face because she reprimanded him for using profanity toward their baby.

Their relationship ended following an altercation in 2015. Natalia recalled Jeffrey pinning her on the bed and encouraging his bulldog to attack her in front of the children. The parties divorced in 2016. The court granted Jeffrey and Natalia joint legal custody and granted Natalia physical care of the children. But the court limited Jeffrey's visitation until he could provide a clean and safe home with a bed for each child. Upon that occurrence Jeffrey's parenting time would have increased to alternating weekends from Thursday through Sunday. The court also ordered Jeffrey to pay child support of $197 per month.

In the months following the divorce, the children stayed at Jeffrey's place on alternating weekends despite the limitations on visitation. But he would rarely see the children during the week because he did not have a car to drop them at school. And the situation only got more complicated as time went on. "Jeffrey continued to spiral downward following the divorce," according to a report from the guardian ad litem. He missed several months of visitation in 2017 because he was incarcerated. Jeffrey insisted that he still called from prison every Sunday to talk with his children. He also claimed that Natalia would sometimes ignore his calls.

In September 2017, Natalia remarried. She and her new husband, Matthew, had a child in July 2018.[1]

Meanwhile, Jeffrey was released from prison in October 2017 and resumed his schedule of alternating weekend visitations. But visitation stopped in the summer of 2018 when he moved to Marshalltown to be with his girlfriend Leigha.[2] The record shows Jeffrey was also violent toward Leigha. According to a police report from June 2018, the pair got into a pushing match and Jeffrey threatened to spray her with WD-40 and light her on fire. That same month, Natalia learned that Leigha's eighteen-month-old son had died of complications from blunt-force injuries to the abdomen in February 2018. According to an agent with the Iowa Division of Criminal Investigation, both Leigha and Jeffrey were suspects in the homicide.[3]

---

[1] Natalia testified that Matthew gets along well with R.H. and M.H. and is prepared to adopt them as soon as Jeffrey's parental rights are terminated.

[2] Jeffrey testified that he did not own a car, which made his travel from Marshalltown to Creston difficult.

[3] Jeffrey was caring for the toddler when he started vomiting the day before he died. Jeffrey said the toddler had been wearing pajamas with enclosed feet that

After learning that authorities suspected Jeffrey in a child homicide, Natalia moved to modify the custody order for G.H. and R.H. and asked to suspend Jeffrey's unsupervised visitations with the children. The district court issued an order temporarily suspending visitation and set a hearing. During the modification proceeding, Natalia reported receiving only $492 in child support from Jeffrey since the divorce was final. She received that amount in 2018 through withholding from Jeffrey's paycheck for a job from which he was terminated.

Jeffrey did not participate in the hearing. But he did send Natalia a threatening text message. He told her he did not "give two fucks about the court date" and would "be there to get my kids soon anyway." As a result, in August 2018, the court entered a default modification judgment granting Natalia sole legal custody of their children. The court suspended Jeffrey's unsupervised visitation and provided for once a week supervised visitation if Jeffrey provided advance notice to a visitation supervisor. Bypassing that opportunity, Jeffrey failed to make arrangements to exercise his visitation rights. Jeffrey testified he was stymied after his former father-in-law declined to be the visitation supervisor. But he acknowledged "there was lots of people that could have done it, I guess."

Jeffrey's last contact with the children was in September 2018 when he attended G.H.'s soccer game. He has not seen either child or provided any financial support since then.

In January 2019, Natalia petitioned to terminate Jeffrey's parental rights. She alleged that he had not maintained meaningful and significant contact with the

---

were too big for him, causing him to fall a few times. At the time of the termination hearing, the State had not filed charges in the child's death.

children and had not paid his child support. Both parents testified at a hearing on the petition in April 2019. Jeffrey acknowledged at the termination hearing that he had a history of substance abuse and alcohol addiction. But he was doing "nothing" in terms of treatment. He also acknowledged he was hospitalized in November 2018 after attempting suicide but was not currently receiving mental-health treatment. As for employment, Jeffrey confirmed that he started working for a construction company a week earlier. But he did not report the new employment to the Child Support Recovery Unit so that child support could be withheld from his wages. Neither did he report his work at Lennox, the HVAC contractor, in Marshalltown.

In its termination order, the district court ruled that Natalia proved by clear and convincing evidence that Jeffrey had abandoned G.H. and R.H. The court also found proof that Jeffrey had failed to contribute to the support of the children without good cause. From those findings, the district court terminated Jeffrey's parental rights. He now appeals.

## II. Scope and Standard of Review

We review private termination proceedings de novo. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). In doing so, we give weight to the district court's findings of fact, especially when considering witness credibility, but they do not bind us. *Id.* When interpreting chapter 600A, we give parents' rights due consideration. Iowa Code § 600A.1. But our paramount concern is the best interests of the children. *Id.*

### III. Analysis

A parent may petition to terminate the rights of the other parent. Iowa Code § 600A.5(1)(a). After a hearing, the court may terminate parental rights on the grounds listed in section 600A.8. *Id.* § 600A.9. Here, the court found clear and convincing evidence supported termination under section 600A.8(3) ("The parent has abandoned the child.") and 600A.8(4) ("A parent has been ordered to contribute to the support of the child . . . and has failed to do so without good cause."). When the court terminates under both theories, we will uphold the termination if substantial evidence supports either ground. *In re B.L.A.*, 357 N.W.2d 20, 22 (Iowa 1984). We find ample evidence in this record to support termination of Jeffrey's parental rights for failure to contribute to the support of his children without good cause under Iowa Code section 600A.8(4).

Under the divorce decree, Jeffrey had an obligation to pay $197 per month in child support. As of March 2019, he owed back support of $7303. He paid no support at all in 2016, 2017, or 2019. The only amount he paid was $492.08 in 2018 when he had child support withheld from his wages before he was terminated from the position.

The district court addressed Jeffrey at the termination hearing about his failure to contribute:

> I didn't hear any testimony that you are not physically able to work other than the period of time you were in prison. As a matter of fact, you did work while in prison. So you are able, but yet since your divorce in 2016, you've only provided support to the children in the amount of $492 for two children. . . . Almost four years now that you've been divorced and $500 for two kids, that's just over $100 a year. So your support for your children has been minimal during that time. Actually, you know, more negligible than minimal, essentially nothing.

Now, Jeffrey does not deny his failure to live up to his financial obligation to his children. Instead, he claims good cause. He argues Natalia did not show he had the reasonable ability to pay child support. Jeffrey asserts his limited means stem "from his mental illness and resulting intermittent hospitalizations, frequent moves to different communities, and lack of employment."

Jeffrey's spotty work history does not rise to the level of good cause. *See In re C.M.W.*, 503 N.W.2d 874, 876 (Iowa Ct. App. 1993) (rejecting excuse of sporadic employment as good cause for failing to pay child support). The court could glean from Natalia's testimony that Jeffrey was capable of working construction and other jobs but did not hold onto employment for long. The report from the guardian ad litem chronicled Jeffrey's work history, showing he had as many as six different employers since the divorce. Even during his short work stints, Jeffrey did not make any voluntary payments toward his child-support obligation. We find no merit in his claim that lack of employment constituted good cause for not providing financial support to his children. *See id.*

Next, Jeffrey blames his mental health for his financial instability. He explains that "mental health issues could very well contribute to marginal income-producing ability or an inability to find work, stay employed, or transition to other forms of employment." That explanation may be true. But it does not justify his failure to pay any amount of child support while he was working. Equally important, Jeffrey was not seeking mental-health treatment at the time of the trial, despite a recent hospitalization. We are unpersuaded by his claim that his mental-health disorders prevented him from paying child support. *See In re O.B.*, No. 20-0304,

2020 WL 4201689, at *3 (Iowa Ct. App. July 22, 2020) (noting father's mental-health and substance-abuse issues but finding no good cause for his failure to make required child support payments).

When asked if he reported his current employment or his job at Lennox for child support purposes, he admitted not having done so and provided no explanation why not. Plus, Natalia testified that Jeffrey had the means to take a trip to Colorado, yet he did not contribute toward the children's expenses. We find no good cause in the record for Jeffrey's failure to provide financial support.

Having found clear and convincing proof for the statutory grounds for termination under section 600A.8(4), we would normally turn to the best-interest question. *See In re Q.G.*, 911 N.W.2d 761, 770 (Iowa 2018) (discussing two-step process for termination proceedings under chapter 600A). But Jeffrey does not make an argument on appeal that terminating his rights was not in the children's best interests. Thus, we need not address that issue. *See id.* at 769. And even if Jeffrey had argued that Natalia failed to prove that termination of his rights was in the children's best interest, we would still affirm.

For private termination proceedings, the Iowa legislature defined the concept of "best interest of a child" as follows:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code § 600A.1.

In our independent view of the record, we find clear and convincing proof that Jeffrey failed to "affirmatively assume" the duties of being a parent. As we determined above, he did not fulfill his financial obligations. On top of that, he did not demonstrate a continued interest in the children's lives. When offered the opportunity to have supervised visitation with them, he made no effort to find someone to supervise. Natalia testified that his relationship with the children has been "nonexistent" since the summer of 2018. Jeffrey has made many choices that have not allowed him to maintain a place of importance in their lives.

Plus, it is not clear that Jeffrey would be a safe caregiver for the children. The record shows an eighteen-month-old child suffered fatal injuries while in Jeffrey's care. And both Natalia and his new girlfriend have reported incidents of domestic violence. The children would benefit from maintaining their stable home environment—without the threat of reintroducing Jeffrey's negative influence.

We find clear and convincing evidence that Jeffrey failed to provide financial support without good cause. And it was in the children's best interests to terminate his parental rights.

**AFFIRMED.**