**IN THE COURT OF APPEALS OF IOWA**

No. 21-1836
Filed June 29, 2022

**IN THE INTEREST OF J.G.,**
**Minor Child,**

**E.A., Mother,**
    Petitioner-Appellee,

**M.C., Father,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Marshall County, Paul G. Crawford,

District Associate Judge.

A father appeals the termination of parental rights to his son.  **AFFIRMED.**

Christopher A. Clausen of Clausen Law Office, Ames, for appellant.

Norma J. Meade of Moore, McKibben, Goodman & Lorenz, LLP,

Marshalltown, for appellee.

Considered by Vaitheswaran, P.J., Tabor, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**TABOR, Judge.**

Manuel, the father of eleven-year-old J.G., appeals the termination of his parental rights under Iowa Code chapter 600A (2021). For most of J.G.'s life, Manuel provided no financial help and had no contact with his son. Manuel blames J.G.'s mother, Eliana, for "putting up roadblocks" between him and their child. At the termination hearing, Manuel testified, "I would love to pay child support and get to know my son." But his subjective desire has not manifested in the assumption of parental duties. Like the district court, we find Eliana presented clear and convincing evidence that Manuel abandoned the child, and termination of Manuel's parental rights is in J.G.'s best interests.[1]

## I. Facts and Prior Proceedings

Manuel and Eliana welcomed their son, J.G., in October 2010. At first they lived with Manuel's family but soon moved into their own home in Newton. Eliana testified that Manuel was unemployed and struggled with drug and alcohol abuse. But Manuel denied substance-abuse problems. Eliana also testified that Manuel physically abused her while she was pregnant with J.G.

The couple separated in August 2011 after a fight at their home. Eliana recalled that Manuel assaulted and strangled her and tried to take J.G. away. She called the police but did not pursue criminal charges. Manuel denies being

---

[1] We review termination decisions under chapter 600A de novo. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). We give weight to the district court's findings of fact, but they do not bind us. *Id.* We accord special deference to that court's credibility determinations. *Id.* When interpreting chapter 600A, we give parents' rights due consideration. Iowa Code § 600A.1. But our paramount concern is the child's best interests. *Id.*

physically aggressive toward Eliana. He moved out of their home, but Eliana told Manuel he could see J.G. as long as he was not using drugs.

For a few months after he moved out, Manuel exercised visitation with J.G., taking the child for a few hours once a week or sometimes for the weekend. But problems arose with those visits. J.G. would often come home crying and feeling sick. And often, Manuel would drop off J.G. at his mother's home and leave, rather than spend time with the child. The paternal grandmother once asked Eliana why she let Manuel take J.G. when he was "not the one taking care of him."

Meanwhile, Eliana started dating Moises. They married in 2012. They lived in Newton and had two more children, J.G.'s half-siblings. Eliana had steady employment. She worked as a financial representative for a medical provider for around ten years. Then, for about one year before trial, she worked for the Iowa Department of Transportation.

After moving out, Manuel communicated with Eliana by calling her at work. Then one day, Manuel was upset and drove to Eliana's home unannounced, demanding to take J.G., who was then about eighteen months old. But Manuel had no car seat for the toddler, and Eliana knew he did not have a driver's license. Manuel tried to pull J.G. from Eliana's arms, hurting him, and Moises called the police. The police charged Manuel with driving while barred. That incident was the last time Manuel saw J.G.

After his arrest, Manuel contacted Eliana less often. When he did call her work, he would say that "he just wanted to see his son." Eliana told him,

> [Y]ou can see him, but we are going to do this the right way because, you know, you just want to show up whenever you want. . . . [W]e

are going to set up child support. You know, the court is going to decide when you can see him and when he is going to be with me.

According to Eliana, when she brought up child support, Manuel would get upset. He said, "there is no need for that" and he never sought a custody order.

At J.G.'s second birthday party, Manuel showed up drunk. Eliana and her family turned him away before he had a chance to see J.G., who was busy playing with his cousins and enjoying his birthday cake. Eliana recalled telling Manuel:

[Y]ou know what, we are not going to argue over this. This is not a good time. When you are feeling better, we will talk about you seeing [J.G.], but I want things done the right way. We have to go through the court. There has to be a set up time because you can't just take him whenever you want.

After that confrontation, Manuel's calls to her work dwindled. He would phone every two to three months, and then a year would go by. When Manuel did check in, he would inquire about J.G.'s well-being but did not ask to see him. He last called three or four years before the termination trial. As for material support, Eliana testified that Manuel brought J.G. diapers and toys once around 2011 but never provided any other financial support, gifts, cards, or letters.

Manuel testified he stopped calling Eliana at work because she threatened to tell the police that he was harassing her. He did not have her cellphone number and believed he "had no way of communicating with her for [their] son." When asked why he did not pursue a custody order, Manuel referred to his undocumented immigration status. He testified that he could not go to court without facing scrutiny: "Where do you work? What do you do? And without having a Social Security, I mean, what [are] they going to do? I didn't know what was going to happen to me."

Manuel confirmed that he last offered support for J.G. when he was around two years old. He claimed that he stopped because Eliana "would tell me, no, I don't need help. He already has a father." Manuel recalled leaving supplies on her doorstep and driving by later to find they were still outside. Manuel also confirmed not seeing J.G. since he was eighteen months old. What's more, he never sent J.G. cards or presents for his birthday or holidays. When asked why, he responded "[a] card? Where was I going to mail it to? So no," and "[w]here was I going to take the birthday present to? I don't know her address. I don't know where she moved to." Manuel testified he was reluctant to inject himself into J.G.'s life because of the time Moises called the police. Manuel was worried that picking up criminal charges could trigger his deportation. But the father admitted that because of the lack of contact, J.G. does not know him.

When Eliana's termination action came to trial, Manuel was in jail on charges of indecent contact with a minor. Because of those charges, he faced removal proceedings. His criminal record also included convictions for driving while barred, serious misdemeanor assault, and fifth-degree theft. Manuel testified that before his latest arrest he was self-employed doing landscaping, construction, and roofing. And before that, he worked at JBS meatpacking. As for his immigration status, Manuel testified that he came from Mexico to Marshalltown when he was six years old. He contacted an immigration attorney two or three years before the termination trial when immigration and customs enforcement intervened after he was stopped for driving while barred.

In September 2021, Eliana petitioned to terminate Manuel's parental rights to J.G. She testified that Moises wants to adopt J.G., who considers Moises to be

his father. After trial, the court found that Manuel abandoned the child under Iowa Code section 600A.8(3). And the court determined that termination was in J.G.'s best interests. Manuel appeals the finding of abandonment. Eliana waived her opportunity to participate in the appeal.

## II. Analysis

Terminations under chapter 600A involve two steps. *B.H.A.*, 938 N.W.2d at 232. First, the petitioner must prove a ground for termination by clear and convincing evidence. Iowa Code § 600A.8. Second, the petitioner must show termination is in the child's best interests. *See id.* § 600A.1; *B.H.A.*, 938 N.W.2d at 232.

### A. Abandonment

Addressing the first step, the district court decided that Eliana proved by clear and convincing evidence that Manuel abandoned J.G. Under chapter 600A, "[t]o abandon a minor child" means the parent "rejects the duties imposed by the parent-child relationship, . . . while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." Iowa Code § 600A.2(20). A parent is "deemed to have abandoned [a] child" who is six months or older at the termination hearing

> unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
>     (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
>     (2) Regular communication with the child or with the person having the care or custody of the child, when physically and

financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.[2]

*Id.* § 600A.8(3)(b). A parent's subjective intent "unsupported by evidence of acts . . . manifesting such intent" does not prevent a finding of abandonment. *Id.* § 600A.8(3)(c).

Manuel's primary argument is that Eliana prevented him from visiting with the child by demanding that he first obtain a custody order. According to Manuel, if he pursued a custody order, "he would be asked about his immigration status and likely be taken into custody at that time."[3] He accuses Eliana of "essentially weaponizing" immigration law to undermine his parental relationship with J.G. While that argument might hold sway under different circumstances, here it misses the mark for many reasons.

First, we can affirm without reaching the question of Eliana's interference with Manuel's visitation. A parent's lack of financial support is the initial test for abandonment. *See In re K.W.*, No. 14-2115, 2015 WL 6508910, at *3 (Iowa Ct. App. Oct. 28, 2015) ("Under section 600A.8(3)(b), the threshold element of 'substantial and continuous or repeated contact' is economic contributions."). If Manuel abandoned J.G. under the financial-support prong, we need not consider

---

[2] A third option is "[o]penly living with the child for a period of six months within the one-year period immediately preceding." Iowa Code § 600A.8(3)(b)(3). Manuel concedes that alternative does not apply.

[3] Manuel acknowledges cases involving no-contact orders or incarcerated parents where our court has held that parents must "take personal responsibility" for conduct that left them unavailable to care for the child. *See, e.g., In re J.L.W.*, 523 N.W.2d 622, 624 (Iowa Ct. App. 1994), *overruled on other grounds by In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). But he distinguishes his case by submitting it was not his conduct that led to his immigration status because he was brought to the United States as a young child.

whether Eliana prevented visitation or communication. Iowa Code § 600A.8(3)(b)(1), (2); *see In re G.D.*, No. 20-0984, 2021 WL 2126174, at *3 (Iowa Ct. App. May 26, 2021) ("Substantial and continuous or repeated contact with the child is shown by: (1) financially contributing to the support of the child in a reasonable amount according to the parent's means ('cash'), and (2) maintaining sufficient contact with the child as defined in section 600A.8(3)(b)(1)–(3) ('contact'). For a parent to avoid being deemed to have abandoned the child, the parent must meet *both* the cash and contact components of the statute.").[4]

The undisputed evidence shows that Manuel did not provide financial support for J.G. after the incident when Moises called the police. Before that, he provided diapers and toys one time, according to Eliana. Manuel insists he brought diapers and toys several times, but Eliana rejected the overtures. But he admits he provided no support after J.G.'s second birthday.

Nothing in the statutory language suggests the obligation to make financial contributions can be overcome by the custodial parent shunning that support. The "prevented from doing so" language appears in the "visiting" paragraph of section 600A.8(3)(b). No such caveat applies to the financial element of abandonment. And Manuel has identified no case in which the custodial parent declining to accept resources overrode this basic parental obligation. *See B.H.A.*, 938 N.W.2d at 234 ("Our courts have long held that all parents are legally obligated

---

[4] A child support order is unnecessary to find the parent failed to provide reasonable financial support. *In re W.W.*, 826 N.W.2d 706, 710 (Iowa Ct. App. 2012). "[T]hose types of payments are subject of a separate provision." *Id.* (citing Iowa Code § 600A.8(4) (providing grounds exist for private termination of parental rights if "[a] parent has been ordered to contribute to the support of the child or financially aid in the child's birth and has failed to do so without good cause")).

to support their children. . . . [The father's] obligation to support [the child] persists until his parental rights are terminated." (citations omitted)).

As the district court noted, Manuel balked at the prospect of paying child support, telling Eliana that he saw "no need." The district court emphasized: "There was no evidence of [Manuel] making or even offering to make a financial contribution towards his child's upbringing," other than the diapers. And the court did not construe her one-time rebuff of a box of diapers as "rejecting support."[5] Manuel testified to "giving up" after the initial rejection of his offer. Thus, the record shows Manuel was content to allow Eliana to raise their son by herself—though he was employed and able to contribute to J.G.'s support. *See* Iowa Code § 600A.8(3)(b). Ultimately, we are unpersuaded by Manuel's testimony that he would have paid child support if given the chance. After minimal offers of support in J.G.'s toddler days, Manuel ignored that parental responsibility for the next nine years. Eliana proved he did not make reasonable contributions toward J.G.'s support, an essential element of his duty to maintain substantial and continuous or regular contact with the child.

Second, even if Eliana could be faulted for snubbing his financial support, her request for a custody order did not prevent Manuel from visiting or communicating regularly with J.G. A custodial parent may set reasonable conditions on visitation. *See, e.g.*, *In re C.H.*, No. 21-0064, 2022 WL 108953, at *2 (Iowa Ct. App. Jan 12, 2022); *In re G.A.*, 826 N.W.2d 125, 129 (Iowa Ct. App.

---

[5] In determining whether a parent has abandoned a child, there is no obligation on the petitioning parent to ensure the other parent carries out the duties specified. *See* Iowa Code § 600A.8(3)(c). Eliana did not have to establish a formal support order on Manuel's behalf.

2012). Eliana was concerned about Manuel's history of domestic violence and substance abuse. Her concerns were justified when Manuel arrived at her home unannounced and tried to take J.G. in his car, without a child seat and while driving unlicensed. And again when he showed up drunk at J.G.'s second birthday party. Under these circumstances, it was reasonable for Eliana to request a formal custody order so that a court could determine whether Manuel was a safe caretaker and establish a fixed visitation schedule.

Third, Manuel failed to provide evidentiary support for his assertion that seeking a custody order would have endangered his immigration status. Manuel testified that he believed the court would ask for information on his employment and demand a social security number. But he also acknowledged that he "didn't know what was going to happen" if he applied for court-ordered visitation. And although Manuel argues his interactions with Eliana have netted him charges, those infractions were based on his conduct. Eliana testified she could have alerted immigration authorities about Manuel's undocumented status any time but did not want to cause him trouble. In short, Eliana did not leverage Manuel's immigration status to prevent him from visiting or communicating with J.G.

Finally, even if we presume Eliana prevented Manuel from visiting J.G, Manuel also failed to maintain regular communication with J.G. or Eliana, which could have avoided the abandonment finding. *See* Iowa Code § 600A.8(3)(b)(2). He did not write letters to J.G., did not send gifts or cards, did not try to contact him by telephone, and did not even consistently call Eliana for updates on his well-being. None of those activities would have jeopardized Manuel's immigration status. While Manuel testified Eliana threatened him with harassment for calling

her work, her testimony was that she always took his calls unless she was busy. He claimed he did not send cards or gifts because he did not know Eliana's address. But, at a minimum, he knew her work number and could have asked for her address.

At bottom, clear and convincing evidence shows that Manuel failed to maintain substantial and continuous or repeated contact with J.G.—amounting to abandonment of his parental responsibilities.

## B. Best Interests

The second step is to determine whether termination is in J.G.'s best interests. The best interests of a child "requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent." Iowa Code § 600A.1(2). Those duties include "the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life." *Id.* We also weigh the child's "physical, mental, and emotional condition and needs" and the "closeness of the parent-child relationship." *In re Q.G.*, 911 N.W.2d 761, 771 (Iowa 2018) (borrowing from Iowa Code section 232.116(2)–(3) to flesh out the best-interests test).

On appeal, Manuel does not advance a best-interests argument. So that issue is waived. *See* Iowa R. App. P. 6.903(2)(g)(3). But if we were to reach it, we would find that termination is in J.G.'s best interests. This eleven-year-old boy was just two when he last had contact with Manuel. For those nine years, Moises

has been filling the role of J.G.'s father. It is in J.G.'s best interests to make that relationship a permanent feature of his life by allowing Moises to adopt him.

In sum, we find Manuel abandoned J.G. under section 600A.8, and termination of Manuel's parental rights is in J.G.'s best interests.

**AFFIRMED.**