**IN THE COURT OF APPEALS OF IOWA**

No. 22-0028
Filed July 20, 2022

**IN THE INTEREST OF J.S.,**
**Minor Child,**

**T.P., Mother,**
    Petitioner-Appellee

**J.S., Father,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Plymouth County, Daniel Vakulskas, District Associate Judge.


The father appeals the termination of his parental rights in a private termination action. **AFFIRMED.**


Kelsey Bauerly Langel of Bauerly & Langel, P.L.C., Le Mars, for appellee mother.

John S. Moeller of John S. Moeller, P.C., Sioux City, for appellant father.

Missy Clabaugh of Clabaugh & Goslinga PLC, Sioux City, guardian ad litem for minor child.


Considered by May, P.J., and Greer and Chicchelly, JJ.

**GREER, Judge.**

The district court granted the mother's petition to terminate the father's parental rights to J.S., born in 2016, in a private termination action. The court concluded the grounds for termination were satisfied under Iowa Code section 600A.8(3)(b) (abandonment) and (4) (failure to contribute) (2021). The father appeals the termination, arguing he did not abandon J.S. and termination of his parental rights is not in J.S.'s best interests.

**I. Background Facts and Proceedings.**

The mother and father divorced in May 2017, when J.S. was approximately fourteen months old. The mother was awarded physical care of J.S., while the father was given visits on Wednesday evenings and alternating weekends.

For the first approximately eighteen months after the parents divorced, the father regularly exercised his visits with J.S. But then he began to miss his mid-week visits, and the weekend visits became irregular. In June 2019, the father visited J.S. just twice. In July, there was only one visit. And then, from late July until December 2019, there were none. The father spent time with J.S. two separate days in December, but, as of the October 2021 termination trial, he had not seen him since those December visits (with the last visit being December 24, 2019). The mother continued to send the father messages, updating him about J.S.'s medical needs, where he was being enrolled in school, and their new address when she and J.S. moved. Other than a March 2020 request to see J.S.,[1]

---

[1] The mother denied this request, responding that the family had entered self-quarantine due to the COVID-19 pandemic and the recommendations of public health officials. We agree with the district court's conclusion that "[i]t was reasonable for [the mother] to deny the visit at that time due to the massive

the father neither responded to the mother's messages nor sent any of his own. In June 2021, about eighteen months after the father last had contact with J.S., the mother filed the petition to terminate the father's rights.

During those eighteen months, the mother began dating and married her current husband, J.P. With the first meeting occurring when J.S. was close to four years old, J.P. testified at the termination trial, explaining some of the activities he and J.S. like to do and how he has taken on a parental role in J.S.'s life. J.P. would like to adopt J.S.

J.S.'s kindergarten teacher testified at the termination trial. She praised J.S. as "one of [her] top students," "right on target with reading, math" and "a very good critical thinker." She described a time at the beginning of the school year when J.S. chose to bring in a picture from the mother's and J.P.'s wedding day. According to the teacher, J.S.

> said, "This is my dad, this is my mom,"and real quickly he just said, "This isn't my real dad. My real dad—I don't see my real dad anymore. He doesn't really like kids," and then he just quickly moved on to his next object in his bag. It was just a matter-of-fact quick little snippet that I saw.

The teacher also described a time when she asked the students to draw picture of the time that they were happiest; J.S. drew a picture and said it was him and "[J.P.], but we call him [J.P.'s nickname], he's my dad, and we were swinging in the backyard." J.P. is a common subject of J.S.'s pictures; the teacher noted that J.S. loves to talk about J.P. and "has a great admiration" for him.

---

uncertainty about COVID-19" and "because [the father] had not been in communication for months at a time."

J.S. met with a therapist four times leading up to the termination trial—at the suggestion of the guardian ad litem (GAL). The therapist did not schedule additional sessions because J.S. "is doing well at home and school and doesn't appear to have any behavioral issues" and "[e]motionally he seems to be doing well." The therapist described J.S. as a "talkative and active little kid." When prompted to talk about the father, J.S.

> talked about what he calls his first dad, referring to [the father], and then he would talk about it if I directly asked him questions. But other than that, he did not bring . . . him up on his own. . . . [When talking about the father], [t]here was, I would say, little to no emotion shown. It was kind of more of a fact of this was part of my life for a while, this is not something that is part of my life right now. I would say he didn't have any emotional reaction other than a kid just talking about his life.

When the therapist asked him to draw his family, J.S. drew himself, the mother, and J.P. The therapist observed J.S. with J.P. for a short while; she saw J.S. talk to J.P., tell him about his school day, and give him a hug. She testified "they seemed to have a comfortable relationship, . . . and seemed happy and healthy, and [J.S.] seemed very comfortable with [J.P.]"

The therapist opined that there was not potential harm to J.S. if the father's rights are terminated, noting that J.S. had seen his father only twice in more than two years—both in December 2019. She testified, "I think he's, yeah, moved on, and this is where he's at in life now. That was when he was young. If you ask him, that was a long time ago, because of his whole five years of life." In contrast, she saw the potential for harm if the father's rights were not terminated and he came back into J.S.'s life, testifying:

> [I]t would be confusing for [J.S.], potentially, to understand why now this is coming back or why he is seeing him again, so just it would be

helping him understand all of that at his age, is really tricky sometimes, because in his mind, like I said, he's kind of moved on from that chapter of his life already.

During his testimony, the father described some of the struggles he was dealing with during the time he absented himself from J.S.'s life, including the loss of a friend to suicide, a breach of trust in his relationship with his mother that resulted in financial hardship for him, and experiencing depression. The father suggested he was overwhelmed and had wrongly allowed his relationship with J.S. to suffer but denied he ever meant to abandon J.S. During direct examination the father testified as follows:

> Q. Have you ever intended to abandon [J.S.]? A. Absolutely not. I would never do that.
> Q. You—you indicate that he's in your thoughts every day? A. Every day.
> Q. So why . . . is there a disconnect between him being in your thoughts every day and then your trying to do something to see him? A. You know, before I wasn't in any place to see him. Like, you know, I did everything that [the mother] asked me to do. I would take him places. We would always be doing fun stuff. We—You know, I couldn't be that person that he expected me to be. And I—I didn't want to let him down. And then by the time I was back to where I felt like I could at least go slow and—and start to reestablish that connection again, we were already in this. So I didn't want to force anything, because I don't know what's going to happen.

The father testified he was doing better, explaining he was working more consistently, had started taking antidepressants, and was getting back into exercising.

The GAL supported terminating the father's parental rights. In a written position statement, she said:

> As for lack of contact, while [the father's] testimony leaves no doubt that he was struggling through some issues, there was no evidence presented that would explain making no attempts via mail, phone, or otherwise to maintain any type of relationship and further,

> [he] took no affirmative steps during that time to do anything to address his struggles until after the [p]etition in this case was filed. [The father] discontinued contact with J.S. in August of 2019 and then requested to reengage in December of 2019. [He] was given that opportunity, ha[d] two brief contacts, and then has disappeared from J.S.'s life again. J.S. appears to have moved on in a healthy way. To subject J.S. to the risk of having this happen again would be detrimental to J.S.'s mental health and feelings of self-worth.

The district court granted the petition to terminate the father's parental rights; he appeals.

## II. Standard of Review.

We review private termination proceedings de novo. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). While the best interests of the child is the paramount consideration of the termination proceeding, the parent's interest in continuing a relationship with their child must also be given due consideration. *See* Iowa Code § 600A.1.

## III. Discussion.

Private termination proceedings under Iowa Code chapter 600A are a two-step process. *See B.H.A.*, 938 N.W.2d at 232. The petitioning parent must establish by clear and convincing evidence the statutory ground or grounds authorizing the termination of parental rights. *Id.* Then, after proving the statutory ground or grounds, the petitioner must also prove that termination of parental rights is in the best interest of the child. *Id.*

**Statutory Ground.** The district court concluded that the mother proved two separate grounds for termination—that the father failed to meet his child-support

obligation under section 600A.8(4)[2] and that he abandoned J.S. under section 600A.8(3)(b).[3] On appeal, the father only challenges the court's conclusion he abandoned J.S. Whether it was inadvertent or intentional, he does not develop an argument challenging the district court's determination he failed to contribute to J.S. as ordered, so he has waived any alleged error to that ground. We only need to find one of the two grounds established by clear and convincing evidence to affirm the termination. *See In re B.L.A.*, 357 N.W.2d 20, 22 (Iowa 1984). Without further consideration, we conclude the mother proved the ground for termination under section 600A.8(4).[4]

---

[2]The court may terminate under section 600A.8(4) when "[a] parent has been ordered to contribute to the support of the child or financially aid in the child's birth and has failed to do so without good cause."

[3] The court may terminate a parent's rights for abandonment under section 600A.8(3)(b) when:

> If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

[4] The father was ordered to pay $274.21 per month in child support as part of the parties' May 2017 dissolution decree. At the time of the October 2021 termination trial, he owed more than $5000.00 in unpaid support and had not made any payments since he made a partial payment in January 2020.

**Best Interests.**  The father contests that termination of his parental rights is in J.S.'s best interests.

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent.  In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code § 600A.1(2).  In determining what is in J.S.'s best interests, we look to the father's past performance, "for that performance may be indicative of the quality of the future that parent is capable of providing."  *B.H.A.*, 938 N.W.2d at 233 (citation omitted).

We do not minimize the gravity of the issues the father was dealing with, nor do we doubt the sincerity of his wish to resume a relationship with J.S.  But, like the district court, we conclude termination of the father's parental rights is in J.S.'s best interests.  Whether due to his young age, because of his close relationship with J.P., or for some other reason, J.S. is a well-adjusted kid in spite of the father disappearing from his life.  And according to the therapist, J.S. has already moved on; the potential harm comes not from terminating the father's parental rights but from reopening the door to the father.  We recognize the father's regret and his wish for a different outcome, but our focus is on what is best for J.S.—that requires us to affirm the termination of the father's parental rights.  *See In re Q.G.*, 911 N.W.2d 761, 771 (Iowa 2018) (considering the child's "physical, mental, and emotional condition and needs" and the "closeness of the parent-child

relationship" in determining the best interests of a child in a private termination action (quoting Iowa Code § 232.116(2), (3))).

**AFFIRMED.**